# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA                          17-CR-438 (VEC)

-against-

EDWIN CORTORREAL
--------------------------------------------------------x

**Declaration of Nathaniel Adams**

I, Nathaniel Adams, pursuant to 28 U.S.C. § 1746, declare as follows:

# 1   Qualifications

I have a Bachelor of Science degree with a major in Computer Science from Wright State University (Dayton, Ohio). I am enrolled in the Graduate School at Wright State University, pursuing a Master of Science degree in Computer Science. I am employed as a Systems Engineer at Forensic Bioinformatic Services, Inc. in Fairborn, Ohio. My duties include analyzing electronic data generated during the course of forensic DNA testing; reviewing case materials; reviewing laboratory protocols; and performing calculations of statistical weights, including custom simulations for casework and research projects. I actively use, develop, and maintain a number of software programs to assist with these efforts. In 2014 I attended a week-long workshop on interpreting forensic DNA mixtures using emerging software solutions. In 2018 I attended a four-day training workshop for the STRmix™ probabilistic genotyping (PG) software. I have been involved in reviews of probabilistic genotyping analyses in criminal cases, including direct inspection of probabilistic genotyping software systems source code and associated software development materials. I have testified in state courts in Washington State, Pennsylvania, Texas, Nebraska, Tennessee, Georgia, Illinois, and Alaska. I have testified in federal courts for the Southern District of New York, the Eastern District of Michigan, and the District of Minnesota. I have testified in courts in the State of Victoria, Australia and the Province of Nova Scotia, Canada. Most recently, in July of 2021, I was qualified as an expert in probabilistic genotyping and forensic DNA data interpretation in East Feliciana Parish Criminal Court in Louisiana.

## 2   Overview

I have been asked by attorneys Jean Barrett and Benjamin Silverman to address whether the validation of the Forensic Statistical Tool (FST) probabilistic genotyping software was developed, tested, and validated in accordance with software engineering standards and principles. To do so, it is appropriate to discuss the principles of software engineering, the current state of software validation practices in the field of forensic DNA analysis, and whether FST has achieved or surpassed any appropriate minimum criteria used to assess system quality or reliability.

Materials provided to me directly in the context of *United States v. Edwin Cortorreal* include copies of case files for New York City Office of the Chief Medical Examiner (OCME) case numbers FB-06-01922 and FBS-20-00663; FST Validation binders; Quality Control Test documents; documents and media pertaining to New York State DNA Subcommittee reviews of FST; and FST source code and database backups.

## 3   Uncertainty in DNA mixture interpretation

Professor David Balding describes, in his article "Evaluation of mixed-source, low-template DNA profiles in forensic science,"[1] the difficulties in establishing certainty when using likelihood ratios (LRs) to calculate statistical weights for low-template DNA (LTDNA) samples:

> There is no "gold standard" test of an LR calculation for LTDNA profiles. Likelihoods reflect uncertainty, and even when the profiles of the true contributors are known in an artificial simulation, this does not tell us what is the appropriate level of uncertainty justified by a given observation affected by stochastic phenomena. Likelihoods depend on modeling assumptions, and there can be no "true" statistical model for a phenomenon as complex as an LTDNA profile.

There is a meaningful difference between validation of an objectively verifiable process and

---

[1] Balding, D.J. (2013). "Evaluation of mixed-source, low-template DNA profiles in forensic science." Proc. Natl. Acad. Sci. U. S. A. 110(30):12241–6.

evaluating the accuracy of conceptual comparisons made by probabilistic genotyping software. Christopher Steele and Professor David Balding describe this in their work *Statistical evaluation of forensic DNA profile evidence*[2]:

> Laboratory procedures to measure a physical quantity such as a concentration can be validated by showing that the measured concentration consistently lies within an acceptable range of error relative to the true concentration. Such validation is infeasible for software aimed at computing an LR because it has no underlying true value (no equivalent to a true concentration exists). The LR expresses our uncertainty about an unknown event and depends on modeling assumptions that cannot be precisely verified in the context of noisy CSP [crime scene profile] data.
>
> Some progress can be made in evaluating the validity and performance of software. Courts need these kinds of evaluations to have confidence in the results of software-based forensic analyses. Open source software is highly desirable in the court environment because openness to scrutiny by any interested party is an invaluable source of bug reports and suggestions for improvement.

Without ground truths, against which we can compare the results of FST's calculations, an alternative set of criteria for assessing the correctness of those calculations must be defined.

The likelihood ratios used in forensic DNA analysis are categorized as "exclusionary" if they are less than 1 (e.g. an LR of 1/10,000) and "inclusionary" if they are over 1 (e.g. an LR of 10,000). Variously, experts and labs might describe a range of values near 1 within which an LR is "inconclusive." It is my understanding that OCME does not use an "inconclusive" range.

Inclusions and exclusions of people's reference profiles can be used as ground truths for samples of known composition, i.e. lab-made samples. That is, if Person A's DNA is included in a lab-

---

[2] Steele, C. D., & Balding, D. J. (2014). "Statistical evaluation of forensic DNA profile evidence." Annual Review of Statistics and Its Application, 1, 361–384.

made mixture, we can test whether a probabilistic genotyping system, given the mixture data, correctly assigns a positive likelihood ratio in support of the inclusion of Person A as a possible contributor to that mixture. If forensic DNA laboratory reports involved only an assessment of whether a person of interest is included or excluded as a possible contributor to the sample, these types of tests might be sufficient. They are not sufficient if numerical likelihood ratios are to be reported.

As described by Dr. Steele and Dr. Balding, no such ground truth is available for the actual, quantitative value of a likelihood ratio. While we know in this example that Person A's reference genotype, when compared to the mixture, should result in a positive LR, we do not know *precisely how positive* that LR should be (e.g. 10,000 vs 1 million). Since it can't be known if the system's LR results are correct, it's most appropriate to focus quality assurance efforts on ensuring the system's process by which it calculates LR's is correct, i.e. that the software's actual behaviors match its intended behaviors.

In 2015 Haned, et al. described the state of probabilistic genotyping software validation, "Although no guidelines yet exist on the best methods to validate forensic DNA interpretation software for casework use, we can draw on the collective wisdom of other disciplines to guide our inquiry."[3] Since 2015, guidance on the subject of validation has been issued by the Scientific Working Group on DNA Analysis Methods (SWGDAM) and the International Society for Forensic Genetics (ISFG).[4,5] The Academy Standards Board (ASB) issued a standard for validation last year.[6] A

---

[3] H. Haned, P. Gill, K. Lohmueller, K. Inman, and N. Rudin (2015). "Validation of probabilistic genotyping software for use in forensic DNA casework: Definitions and illustrations," Sci. Justice 56(2):104-108.

[4] Scientific Working Group on DNA Analysis Methods (2015). "Guidelines for the Validation of Probabilistic Genotyping Systems," 2015. Available: https://www.swgdam.org/publications

[5] Coble, M. D., et al. (2016). "DNA Commission of the International Society for Forensic Genetics: Recommendations on the validation of software programs performing biostatistical calculations for forensic genetics applications." Forensic Science International: Genetics, 25, 191–197.

[6] Academy Standards Board (2020). "ASB Std 018 - Standard for Validation of Probabilistic Genotyping Systems," Available: http://www.asbstandardsboard.org/wp-

major focus of these documents is sensitivity (true positive) and specificity (false positive) testing – inclusion/exclusion accuracy rates.

## 4   Background on software engineering

The basis of all practical software programs is an algorithm[7] or a set of algorithms designed to receive input, perform calculations on this input, and produce output. Algorithms include steps where data is evaluated, and most algorithms involve steps where decisions are made, based on those evaluations. Models describing how the data is evaluated, as well as the decisions to make, can be conceptually described in scientific papers. However, because computers cannot directly process the technical English descriptions, diagrams, and mathematical notation that usually constitute the bodies of these articles, these human-readable steps or operations must be translated to instructions written in a computer-readable language (binary machine code). Source code is a set of instructions written in a programming language. Programming languages serve as intermediate translations between natural human and binary machine languages; they serve as a common language that is understandable by humans and that is defined such that it can be further translated to machine code in a manner that produces precisely predictable results.

Software engineering is "the systematic application of scientific and technological knowledge, methods, and experience to the design, implementation, testing, and documentation of software."[8] To this end, a major focus of the field of software engineering is the Software Development Process [see Appendix 1].

Many standards-setting bodies have published hundreds of documents describing standards for the development of software, both generally and for specific industries and applications. These

---

content/uploads/2020/07/018_Std_e1.pdf

[7] Algorithm: "A procedure or set of rules used in calculation and problem-solving; (in later use spec.) a precisely defined set of mathematical or logical operations for the performance of a particular task." (Oxford English Dictionary)

[8] ISO/IEC/IEEE (2010). "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E).

standards-setting bodies include the International Organization for Standardization (ISO) and the US National Institute of Standards and Technology (NIST) as well as industry organizations of computing professionals such as the Institute of Electrical and Electronics Engineers (IEEE) . The topics of these standards and advantages for adhering to them include definitions of minimum acceptable product quality, improved product quality assurance, decreases in development time and cost, and increased (re)usability of the systems being developed. Many approaches exist for ensuring such standards are adhered to, including formal legislation, organizational appraisals, standard industry practices, and contractual obligations.

General industry standards and principles of software engineering can be used to ensure common goals of high performance, correctness, transparency, usability, and maintainability of software systems. The ISFG PG validation guidance states, "International industry standards apply to software validation, verification and test documentation. These standards can be simplified and extrapolated to forensic genetics." It cites software standards documents published by IEEE and the US Food and Drug Administration as exemplar software standards. Similarly, ASB Std 018 references an IEEE software standard on verification and validation. It does not, however, prescribe particular software engineering tasks to undertake.

# 5   Verification and validation (v&v)

## 5.1   Definitions in the field of software engineering

Before defining "verification and validation" in a software engineering context, we must have an understanding of the intended operation of a software program or system, termed "requirements" and "specifications":

> **Requirement:** a condition or capability that must be met or possessed by a system, product, service, result, or component to satisfy a contract, standard, specification, or other formally imposed document. Requirements include the quantified and documented needs, wants, and expectations of the sponsor, customer, and other stakeholders.[8]

> **Specification:** a document that fully describes a design element or its interfaces in

terms of requirements (functional, performance, constraints, and design characteristics) and the qualification conditions and procedures for each requirement.[8]

A key aspect of specifications involves defining falsifiable qualification conditions, also known as "acceptance criteria." With falsifiable acceptance criteria and given a set of inputs, testing the system against a specification can show that the system does or does not achieve acceptance, i.e. that it either passes or fails a test, given a set of inputs. The Software Engineering Book of Knowledge recognizes that particular attention should be paid to the form and notation of requirement specifications:

> The general rule is that notations should be used that allow the requirements to be described as precisely as possible. This is particularly crucial for safety-critical, regulatory, and certain other types of dependable software.[9]

Validation is defined by the IEEE[8] as, "the process of providing evidence that the software and its associated products satisfy system requirements allocated to software at the end of each life cycle activity, solve the right problem, and satisfy intended use and user needs." Demonstrating that the software's actual behaviors match the intended behaviors described in the requirements and specifications documents is a critical component of the verification and validation process.

As quoted above, the ISFG paper states, "International industry standards apply to software validation, verification and test documentation. These standards can be simplified and extrapolated to forensic genetics." Explicit citations to two IEEE standards documents are given at this place in the ISFG paper:

- IEEE Standard 1012-2012 - *IEEE Standard for System and Software Verification and*

---

[9] Bourque, P. and Fairley, R. E.,  Eds. (2014). *Guide to the Software Engineering Body of Knowledge v3.0*. IEEE Computer Society.

*Validation*,[10] and

- IEEE Standard 829-2008 - *IEEE Standard for Software and System Test Documentation*[11]

Both of these standards documents are publicly available.

The *IEEE Standard for System and Software Verification and Validation* describes processes for verifying and validating software programs and systems. It states in its "Introduction" section:

> The following key concepts are emphasized in this standard:
>
> - …
>
> - *Conformance to international and IEEE standards*. Defines the V&V processes to conform to life cycle process standards such as ISO/IEC 15288:2008, IEEE Std 1074TM-2006, and ISO/IEC 12207:2008, as well as the entire family of IEEE software engineering standards. This standard addresses all system and software life cycle processes, including the Agreement, Organizational Project-Enabling, Project, Technical, Software Implementation, Software Support, and Software Reuse process groups….

It further states in section 1, "Overview," subsection 1.1, "Scope":

> This standard defines the verification and validation processes that are applied to the system, software, and hardware development throughout the life cycle, including acquisition, supply, development, operations, maintenance, and retirement. This standard applies to the system, software, and hardware being acquired, developed,

---

[10] IEEE (2012). "IEEE Standard for System and Software Verification and Validation," IEEE Std 1012-2012, pp. 1-223.

[11] IEEE (2008). "IEEE Standard for Software and System Test Documentation," IEEE Std 829-2008, pp. 1-150.

maintained, or reused.

Subsection 1.1, "Scope," proceeds to describe verification and validation process overviews, including:

The Verification Process provides objective evidence for whether the products perform the following:

a) Conform to requirements (e.g., for correctness, completeness, consistency, and accuracy) for all activities during each life cycle process

b) Satisfy the standards, practices, and conventions during life cycle processes

c) Successfully complete each life cycle activity and satisfy all the criteria for initiating succeeding life cycle activities (i.e., builds the product correctly)

The Validation Process provides evidence for whether the products perform the following:

- Satisfy system requirements allocated to the products at the end of each life cycle activity

- Solve the right problem (e.g., correctly model physical laws, implement business rules, and use the proper system assumptions)

- Satisfy intended use and user needs in the operational environment (i.e., builds the correct product)

Conformance of a software product to requirements and specifications necessitate explicit descriptions of requirements and specifications. If requirements and specifications are not formally declared in documents shared by the designer and developers of a system to serve as an objective reference, subjective decisions and assumptions necessarily take place when the software

developer implements features to satisfy undefined or ill-defined requirements.

Under subsection 1.3, "Field of Application," this same standards document states, "This standard applies to all applications of systems." It proceeds to describe:

> The dynamics of complex systems and the multitude of different logic paths available within the system in response to varying stimuli and conditions demand that the V&V effort examines the correctness of the system for each possible variation in conditions. The ability to model complex, real-world conditions will be limited, and thus, the V&V effort examines whether the limits of the modeling are realistic and reasonable for the desired solution.

It should be noted that IEEE standard 1012-2012, *IEEE Standard for System and Software Verification and Validation*, is only one version of the standard produced by IEEE 1012 WG, Software Verification and Validation Working Group, which published its first standard on software V&V in 1986. In 1992 the working group reaffirmed its 1986 version. Updates/revisions to that standard were published in 1998, 2004, 2012, and 2016. Conversations about software quality assurance, while perhaps novel to the field of forensic DNA analysis, are not novel to the field of software engineering.

## 5.2   System integrity

Confidence in the V&V processes undertaken increases as more granular evaluations are conducted. More in-depth V&V processes require the allocation of more time and resources. A balance must be achieved between the required degrees of confidence that the software program or system operates as intended and the relative value of that confidence in terms of potential life-safety, financial, and social consequences.

IEEE standard 1012-2012, *IEEE Standard for System and Software Verification and Validation,* cited in ISFG's guidance and ASB Std 018, describes four integrity levels that encompass all software programs and systems, descending in significance from 4 to 1. These tables are described in Annex B of the standard [see Appendix 2].

Uses of software span from novelty smartphone apps to airliner navigation systems. It is important to consider a system's likelihood for errors and the potential consequences of those errors or outright failures when determining the verification and validation processes that should be undertaken during development of that system.

I am unaware of any formal guidance on probabilistic genotyping software validation methods that addresses the concept of IEEE integrity levels. I am similarly unaware of any attempt by any forensic science body to reconcile the life-safety, financial, or social consequences of potential errors in a probabilistic genotyping software system with any description of minimal quality assurance tasks that should be undertaken during the development, verification, and validation of these systems.

## 5.3   Methodologies to use

IEEE standard 1012-2012, *IEEE Standard for System and Software Verification and Validation,* describes a checklist for eleven stages of verification and validation procedures generic to all software systems – Table 1c, which constitutes pages 74-99 of the standard document. While not all of these tasks will apply to all applications (e.g. FST), certainly many of them can. Many of the prescribed tasks are indicated by integrity level [see 5.2 System integrity], presupposing that a formal hazard analysis has been conducted on the system at the stage of conception or design of a system and prior to the construction or implementation of that system.

### 5.3.1   Code reviews

Many tasks are universal to all systems. For example, under Table 1c's task list for Activity 9.4, "Software Construction V&V (Software, Process: Software Construction)," subtasks listed under "Correctness" include:

    1)  Verify and validate that the source code component satisfies the software design.

    2)  Verify that the source code components comply with standards, references, regulations, policies, physical laws, and business rules.

3)  Validate the source code component sequences of states and state changes using logic and data flows coupled with domain expertise, prototyping results, engineering principles, or other basis.

4)  Validate the software code and its interactions with other elements do not result in unnecessary, unintended, or deleterious consequences.

5)  Validate the flow of data and control satisfy functionality and performance requirements.

6)  Validate data usage and format.

7)  Assess the appropriateness of coding methods and standards.

These tasks presuppose access to the source code of the software and documentation of pre-constructions decisions, e.g. which coding standards to follow and how code component sequences and states will be documented.

### 5.3.2   Software testing

Other tasks describe the development and use of unit, component, integration, acceptance, and system tests. The IEEE defines software testing as, "the dynamic verification of the behavior of a program on a finite set of test cases, suitably selected from the usually infinite executions domain, against the expected behavior."[12] Software tests are often additional portions of code written in parallel to the main program. This process is called "automated software testing," whereby any changes made to the program can be easily checked against existing "test code" to ensure that modifications or additions to the program a) act as intended and b) do not interfere with other components of the software. Evaluation of these testing portions of a software development process similarly require access to at least the "test code" and preferably the source code of the

---

[12] ISO/IEC/IEEE (2010). "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E).

software itself. Documentation for these tasks are further described in IEEE standard 829-2008, *IEEE Standard for Software and System Test Documentation*, cited in ISFG's guidance document.

It is important to note that "software testing" is a term of art in software engineering, indicating a prescribed process for determining that a portion of a program (or the program as a whole) performs precisely as intended – that intent being having been described as a specification, including acceptance criteria. When claiming that a software system "has been tested," it is important to precisely understand the suitability of those tests, which involves examining *which* portions have been tested and *how* those portions have been tested. Incomplete or ambiguous requirement specification acceptance criteria definitions introduce subjectivity into evaluations of test sufficiency. SWEBOK, describing the "expected" tenet of software tests:

> Expected: It must be possible, although not always easy, to decide whether the observed outcomes of program testing are acceptable or not; otherwise, the testing effort is useless. The observed behavior may be checked against user needs (commonly referred to as testing for validation), against a specification (testing for verification), or, perhaps, against the anticipated behavior from implicit requirements or expectations….

In other words, if no conditions describing a "failed" test are described, no test can be considered "passing."

As an example, imagine a software program that receives as inputs A, B, and C the lengths of the sides of a triangle. Its requirements are to return as output whether the triangle is scalane (no sides are of equal length), isosceles (two sides are of equal length), or equilateral (all sides are of equal length). If its acceptance criteria are limited to testing triangles with sides 1-2-3, 1-1-2, and 1-1-1 and the software returns results of "scalene," "isosceles," and "equilateral," respectively, then we might consider this program as verified – it appears to properly operate, given its requirements and these test data. However, these requirements do not address the inherent property of triangles that a triangle cannot have a side of zero or negative length. Without such a requirement explicitly stated, a programmer could produce a program that receives 0-0-0 as an input and return

"equilateral" as its output. While it is correct that all three "sides" are numerically equal, a side length of zero violates a property of triangles and would properly be considered not a triangle at all. Insufficient testing could easily allow a flawed program to be labeled "verified" or otherwise fit for use.

Automated software testing can help test complex programs because it relies on humans for only the construction of the tests and reviews of the test results – all automated tests are performed by the computer at a pace much faster than a human could manually perform the same calculations and comparisons. This allows for complex programs to be more easily and more thoroughly tested for deviations from expected behavior as often as that testing is needed.

### 5.3.2.1   Coverage and complexity

Coverage of testing is an important measure when evaluating whether a verification and validation process has been sufficient in scope. Testing coverage is typically described as "branch" and "path" coverage. A "branch" is one instruction or a discrete set of instructions. A "path" is a sequence of branches (instructions) executed during one execution of the program. Examples of branches and paths in a trivial program are given in Appendix 3.

Complex programs involve decision branches where values are evaluated to determine which path of execution should be followed. While it is fairly straightforward, though possibly time-intensive, to demonstrate that each branch (instruction) in a complex program has been "tested," it is practically impossible to test every possible state of a program or all possible paths of execution a program can take, given a set of input data. For example, a program that has no decisions (and subsequently always performs all of its instructions in the same sequence) has only one possible path of execution. A program that has only one decision has two possible paths of execution. Because each of these paths can lead to different paths downstream, a second decision added after the first results in two additional paths. Exponential growth is observed if a third decision is added because each of the four previous paths can each lead into one of the two new decisions.

Complex programs involve not only decisions, but also loops and recursive calls, which can rapidly increase the complexity of a program's operation, making exhaustive testing impossible

and thorough testing incredibly difficult. A simple program with ten consecutive decision statements and no loops or recursion has $2^{10}$ (more than 1,000) possible paths, which would be a daunting challenge for someone performing "hand calculations" of the program's behaviors for each path, even before considering that each branch encountered by each path could contain dozens or even thousands of calculations. A program only double that size – 20 consecutive decision statements – has $2^{20}$ (more than 1 million) possible computational pathways. It is plain to see that automated software testing is a helpful tool for software testing tasks, and consequently for software verification and validation processes.

### 5.3.3   Component testing

It is obviously relevant to consider the software as a component of a greater system, and it is often perferred to test software and software components in isolation. The definitions section of IEEE Std 1012-2012 contains a definition for the term,

> **component:** One part that makes up a system. A component may be hardware or software and may be subdivided into other components.

Immediately followed by,

> **component testing:** Testing of individual hardware or software components.

The concept of subdividing systems into more manageable components is a basic principle of good engineering practice. It would be unwieldly for even one person to develop and maintain a software program of any substantial size that has not been modularized into components. It is the entire principle of the IEEE Std 1012-2012 cited by IEEE to rigorously plan, execute, and evaluate software V&V processes at various levels of scope of a program, from individual lines of source code, to the combination of separate components, to the entire system as a whole.

### 5.3.4   Software measures

Concepts of software quality[13] involve measures of various aspects of the software development process, including of the software itself. Various measures exist to evaluate software size, structure (e.g. complexity, coupling), and reliability.[14] Results of these measurements can help identify particularly complex portions of the software that might merit more scrutiny in verification activities.

Measures of software testing efforts can evaluate how much of the program or its requirements have been tested. Test measures can also evaluate how faults in the program were deliberately triggered – and whether the program robustly handled the known faults.

Measures of identified defects, especially as a defect detection rate, can be used to predict the probability of detecting additional defects in the future.

### 5.3.5   Documentation

A litany of documentation is described as required for, or the result of, many of the V&V tasks described in IEEE Std 1012-2012, *IEEE Standard for System and Software Verification and Validation*. The specificity required in these documents is indicated by the criticality/system integrity of the system [see 5.2 System integrity] and obligations of the developer. They can include, but are not necessarily limited to:

- Standards describing practices (e.g. coding standards), either internal to the organization or references to external/public standards

---

[13] Quality: "the degree to which a system, component, or process meets specified requirements." ISO/IEC/IEEE (2010). "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E).

[14] Fenton, N. and Bieman, J. (2015). *Software Metrics: A Rigorous and Practical Approach*, Third Edition. CRC Press, pp. 1-595.

- The source code and executable version of the system

- Security, hazard, criticality, and risk analysis reports

- Software and interface requirements specifications

- Software and interface design descriptions

- Test plans, designs, and reports for unit, component, integration, qualification, verification and validation, and acceptance testing

- User and technical operating manuals

These documents can be considered "living" and modified as the program is developed or, after initial delivery, maintained and updated with bug fixes and feature additions/changes. Logs of modifications made to the original documents can be centrally preserved for inspection in a variety of ways, including a "change log" which summarizes feature changes between subsequent versions.

## 5.4   Independence

Independence of the entity performing V&V tasks from the entity developing the system is discussed in Annex C of IEEE standard 1012-2012, *IEEE Standard for System and Software Verification and Validation*, and worth consideration when evaluating integrity levels of any system to ensure technical, managerial, and financial pressures do not compromise the appropriate levels of independence of the party verifying and validating the software.

## 5.5   Transparency of scientific programs

Advocacy for increased transparency of software in the greater scientific community has been

repeatedly made. Examples include "Shining Light into Black Boxes" by Morin, et al.[15]:

> Requiring that source code be made available upon publication would also be expected to yield substantial benefits—including improved code quality, reduced errors, increased reproducibility, and greater efficiency through code reuse and sharing. Achieving this would bring disclosure and publication requirements for computer codes in line with other types of scientific data and materials.

And in *"The case for open computer programs"* by Ince, et. al[16]:

> Our view is that we have reached the point that, with some exceptions, anything less than release of actual source code is an indefensible approach for any scientific results that depend on computation, because not releasing such code raises needless, and needlessly confusing, roadblocks to reproducibility.

Research into software quality of scientific software has identified multiple factors that complicate the testing of (and consequently detection of bugs or flaws in) scientific software.[17] Two of these factors in particular apply to probabilistic genotyping software. The first is that probabilistic genotyping software is inherently complex and requires specialist knowledge to design and operate. The second is that it has a relatively small user base – more people using software correlates with a greater rate of detecting defects.

---

[15] Morin, A., Urban, J., Adams, P.D., Foster, I., Sali, A., Baker, D., and Sliz, P. (2012). "Shining Light into Black Boxes." Science. 336(6078): 159–160. Available : http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4203337/

[16] Ince, D.C., Hatton, L., and Graham-Cumming, J. (2012). "The case for open computer programs." Nature. 482(7386): 485–488. Available: http://www.nature.com/nature/journal/v482/n7386/full/nature10836.html

[17] Kanewala, U. and Bieman, J. (2014). "Testing scientific software: A systematic literature review" Information and Software Technology 56(10):1219-32.

## 5.6   Software failures

There are many cases of software failures that could have been prevented by more thorough validation processes, including software testing.

Noteworthy examples of software failures include NASA's Mars Climate Orbiter, where metric and US standard units were not properly converted between software modules, causing the Orbiter to be lost or destroyed, likely by disintegrating in Mars' atmosphere.[18] This failure is well-known because it resulted in the loss of an expensive space probe and the investigation board published a public report of its findings. The loss of the Orbiter was found to be primarily due to, "Failure to use metric units in the coding of a ground software file, 'Small Forces,' used in trajectory models," with contributing causes including, "Undetected mismodeling of spacecraft velocity changes," and "Verification and validation process did not adequately address ground software."[19] These findings emphasize the need to test and validate software on both component and systemic bases.

In a life-safety example, the Therac-25 radiation therapy machine's safety lockout bugs caused massive overdoses of radiation to at least six patients, resulting in paralysis and death.[20] While this failure was repeatedly encountered before the underlying cause was identified, it only occurred under specific conditions, emphasizing the need for a suitable number and scope of test cases. The failures of the Therac-25, like the Mars Climate Orbiter, were likely due to a failure to suitably integrate different components of the greater system:

> A "small amount" of software testing was done on a simulator, but most testing was done as a system. It appears that unit and software testing was minimal, with most effort

---

[18] NASA (1999). "Mars Climate Orbiter Team Finds Likely Cause of Loss." Press release, September 30, 1999. Available: https://solarsystem.nasa.gov/news/156/mars-climate-orbiter-team-finds-likely-cause-of-loss/

[19] A. G. Stephenson, et al. (1999). "Mars Climate Orbiter Mishap Investigation Board Phase I Report," Available: https://llis.nasa.gov/llis_lib/pdf/1009464main1_0641-mr.pdf

[20] Leveson, N. G. & Turner, C. S. (1993). "An investigation of the Therac-2S accidents." Computer 26(7), 18-41.

directed at the integrated system test.

It is important to note that many failures of software testing are identified because they are readily apparent to non-expert users, such as when failures cause the loss of property, massive environmental damage, or human death or injury. Due to uncertainties inherent to probabilistic genotyping systems, software failures in these systems might not be readily apparent, absent thorough software testing and reviews of the software engineering documentation and source code.

# 6   FST

The OCME report by Lana Ostojic dated April 16, 2020 states:

> The DNA mixture found on swab 1B from the "roll" of "gray duct tape" is approximately **11,400 times more probable** if the sample originated from Edwin Cortorreal and two unknown, unrelated persons than if it originated from three unknown, unrelated persons. **Therefore, there is very strong support that Edwin Cortorreal and two unknown, unrelated persons contributed to this mixture, rather than three unknown, unrelated persons.** [emphasis original]

Likelihood ratios describe the relative probability of observing the evidence (in this case DNA profiling results) if two competing scenarios had occurred – not the probability that either scenario has actually occurred. LR's can easily be mischaracterized by transposing the conditional. Ian Evett gives an example of correctly and incorrectly reporting a likelihood ratio of 1,000 in his article "Avoiding the transposed conditional":

> Then the interpretation may be expressed as follows:

> *The evidence is 1000 times more likely if the blood came from the suspect than if it came from someone else*

> which may be incorrectly transposed as:

> *The blood is 1000 times more likely to have come from the suspect than from someone else* [emphasis original][21]

It is important to keep in mind that the goal of FST is to calculate probabilities of observing a set of DNA profiles, given two competing explanations of the origin of those profiles, rather than the probability that any particular explanation of the DNA is the true explanation. The probabilities calculated by FST involve the use of various models, including dropout rates and allele frequencies. Even if LR's calculated by FST are properly communicated, I am concerned with the actual calculation of those LR's. My concerns stem from the development and use of FST by OCME.

The FST validation study executive summary document describes FST:

> NYC OCME's Forensic Statistical Tool (FST) models allelic drop-in and drop-out using empirically determined drop-in rates and locus specific drop-out rates for two- and three-person deducible and non-deducible mixtures.

Mitchell, et al. describe its status as of 2012 as, "FST is currently online for analysis of two- or three-person mixtures. Validation of four-person models is currently in progress."[22] I understand that the four-person validation has not yet been completed. Mitchell, et al. also describe the scope of their testing efforts, "In total, more than 557,000 test runs of the program were performed as part of this validation."

My concerns about the development and use of the FST software fall into two major categories. The first category is the adherence to software development standard practices, including documentation of typical software development practices and measures of verification and validation efforts. The second category is the significance of multiple modifications made to FST

---

[21] Evett, I.W. (1995) "Avoiding the transposed conditional," *Sci. Justice* 35(2):127–131.

[22] Mitchell, A. A., et al. (2012). "Validation of a DNA mixture statistics tool incorporating allelic drop-out and drop-in," Forensic Sci. Int. Genet. 6(6):749–761.

following the 2010 FST validation study.

## 6.1   FST Verification and Validation

FST is used to evaluate DNA profiles generated using the Identifiler test kit, which genotypes fifteen autosomal loci. FST validation study documents state, in Volume 1, "Methods," section IV, "Program Evaluation", subsection "Comparison of Manual Calculations to Program Output":

Performance of the program was evaluated by comparing manual calculations to program output for 24 examples. A summary of the scenarios, DNA template quants and loci tested can be found in Table 1F. Program output and Excel files documenting the manual calculations can be found on the following pages. In all instances, the results obtained using the program were identical to the manual calculations.

Though FST evaluates fifteen-locus profiles, these manual calculations were of single-locus LR's. LR's for only eleven of the fifteen Identifiler loci were tested in this manner. Information is not always found at all loci, so subsets of these fifteen loci could be encountered during casework. 32,767 ($2^{15}$-1; ) possible combinations of loci could hypothetically be tested during this phase of testing. This does not incorporate additional factors of computational complexity including homozygosity/heterozygosity of the comparison profile, the alleles observed in the evidence profiles, the deducibility of the evidence profiles, or the assumed number of contributors to an evidence sample.

Documentation of these efforts does not describe any manual evaluations of combinations of multiple loci. Ten of these twenty-four manual LR tests described in Table 1F were performed on single-source samples, leaving only nine tests of 2-person mixture LR's and five tests of three-person mixture LR's, again, at only one locus each time. These twenty-four tests appear to be the extent of FST-calculated likelihood ratios compared to expected values. This cannot be overemphasized – I have received no documentation describing any attempt to verify FST's ability to correctly combine LR's from two or more loci.

No measures of algorithmic complexity or test coverage are described.

At least one section indicates counter-intuitive values, apparently confirmed by OCME as intended behavior. "Interpolation Test #3" under section 1.IV describes *higher* complete heterozygote dropout rates for two-contributor samples containing 100pg of DNA (0.18) than for two-contributor samples containing 50pg of DNA (0.09). Tested quantity values between 100pg and 50pg all resulted in interpolated values between 0.18 and 0.09.

Section 1.V, "Development of null distributions for likelihood ratio statistics" describes difficulties in testing 149 mixed samples against a database of 526 known non-contributors, specifically the time needed to run all desired database searches.

This section of the FST Validation documents describes the actual behavior of the software over 83,234 comparisons but does not comment on whether the actual LR's generated by FST are the LR's intended to be generated, which would serve as a type of acceptance criteria. Put another way, section 1.V lends no support to a claim that FST LR calculations are verified, as no acceptance criteria are described, against which the software can be tested.

## 6.2   Documentation

Other than the descriptions of limited "manual calculations" described above, I have seen few references to or examples of documentation generated by OCME during its development or validation of FST that would support a claim that it has generated the types of documentation described in IEEE Stds 1012-2012 and 829-2008 such as those listed above [see 5.3.5 Documentation].

FST Validation, Volume 1 contains six pages of "Program Logic Flow," which constitutes a design document.

I have requested but not received requirement specifications for FST. Without requirement specifications, including falsifiable acceptance criteria to be used as expected test outcomes, it is not clear to me against what criteria FST test results could be compared for differentiating passing tests from failing tests.

## 6.3   Post-validation modifications

Several modifications have been made to FST following its 2010 validation study. Important considerations when evaluating the impact of changes on existing software system include a) the magnitude of the change in behaviors and b) the rate at which changes in behaviors are expected to occur. For FST, these questions could be asked – "What possible changes in LR's are possible for the same sample analyzed by different versions of FST and for what proportion of comparisons do we expect the LR to change at all?"

### 6.3.1   Locus-dropping

#### 6.3.1.1   Background

In 2016 I was one of several experts hired by the defense team in *United States v. Kevin Johnson*. We were provided a copy of the FST v2.5 source code and sufficient accompanying software materials to inspect and operate the FST v2.5 system. I authored three declarations in that case, which involved an identification and early examination of a previously non-public function of FST. Briefly, that function, *CheckFrequencyForRemoval*, removes a locus from likelihood ratio calculations if allele frequencies for a locus sum to ≥0.97 for any of the four subpopulations used by FST.

This behavior is not described by Mitchell, et al., nor is it described in the FST Validation Study. Users of FST are not notified when locus data are removed from LR calculations.

I have not received falsifiable acceptance criteria, defined before testing, that could be used to differentiate a passing Quality Control Test from a failing Quality Control Test.

#### 6.3.1.2   Competing explanations

##### 6.3.1.2.1   Quality Control Test of Forensic Statistical Tool (FST) Version 2.0

Following modifications made to FST that merited a v2.0 designation, a Quality Control Test was conducted in June, 2011. The summary document for this test states the objective of the test as,

"To verify that version 2.0 generates the same data as the original validated version." The methods involved re-evaluations of twelve two- and three-person samples from the 2010 validation data set. The results state two points:

- Comparisons yielded the expected results (Table 1). In other words, FST version 2.0 yielded the same LR values with both the "go" and the "bulk" search methods that were generated with the version of FST that was previously validated in 2010.

- The only exceptions were two samples which benefitted from one additional feature of FST. Loci wherein the sum of the frequencies was greater than or equal to 0.97 were assigned an LR of one in version 2.0. Two samples had one locus each that displayed such values. Therefore, their LR values were slightly modified as expected. For example, for one sample where the LR at D3 was equated to one, the most conservative LR value was 0.34 previously and was 0.42 with FST version 2.0. Similarly, for the other sample, the LR was previously 3.38E+04 and with FST version 2.0 was 3.82E+04 when vWA was assigned a value of one.

Several aspects of this Quality Control Test summary document are striking:

1. No justification is given for the inclusion of the new feature in FST, though it is described as a benefit. This is a change in FST system requirements.

2. No justification is given for selecting only twelve samples for re-evaluation, nor is any justification given for selecting these specific twelve samples. This is a question of test sufficiency.

3. No justification is given for selecting samples which exhibiting only a single locus triggering this new feature. This is a question of test coverage.

4. No justification is given for why, upon the removal of information from a likelihood ratio calculation, the likelihood ratio calculations a true contributor became *more* inclusionary. While only two samples exhibiting this behavior constitutes a small

25

sample size, likelihood ratios calculated with less information should trend towards 1.0 (an "uninformative" likelihood ratio) – and only one of the two post-modification LR's gets closer to 1.0.

5. The first point states, "FST version 2.0 yielded the same LR values," while the second point states for two of twelve evaluated samples, "LR values were slightly modified as expected." This apparent contradiction is not addressed.

6. Non-contributor comparisons to these twelve samples were conducted as a part of the Quality Control Test efforts, though no description of non-contributor results is included in the summary document, such as the impact of this change on specificity ("false positive") rates or on expected LR ranges for non-contributors. A review of the "samples" sheet documenting the study indicates that the highest non-contributor LR observed for the original FST validation study sample Item5_Study3_3p_D29S_ND_30pg was 4.13 for non-contributor A-NYC135. For the same evaluation using FST v2.0, the highest non-contributor LR was 29.29 for non-contributor MB3578 – a seven-fold increase in the highest non-contributor LR. When examining the LR printouts, the shift in LR's reported for non-contributor MB3578 is even more striking:



Figure 1 – FST-generated LR's for sample Item5_Study3 at 30pg total template, including non-contributor LR's. The original FST LR's are on the left while FST v2.0 LR's for the same comparisons are on the right.

When considering only the change in LR reported for MB3578, a 68-fold increase is observed between the original fifteen-locus LR reported in the original 2010 FST validation study and the

fourteen-locus LR (less vWA) reported during the FST v2.0 Quality Control Test in June, 2011. Ultimately, neither the magnitude of observed changes for non-contributor comparisons is described, nor is an expected rate of change in LR's (e.g. for FST validation study samples) described in materials I have been provided.

### 6.3.1.2.2    January 13, 2017 by the Government

In its January 13, 2017 Opposition to Defendant's Motion to Exclude Evidence Produced by the Forensic Statistical Tool and for a Daubert Hearing, the Government made what I understand to be the first public acknowledgment that FST discards locus data when a threshold is reached:

> FST  disregards the information from any locus in a sample if the alleles present at that locus reflect [redacted] or more of the alleles in the overall population for that locus.  It does so because the existence of such common alleles yields no helpful information.[23]

This explanation prompts two questions. The first is, "If 'the existence of such common alleles yields no helpful information,' why would any change to FST's function be necessary?" The second is, "Is this assertion even true? Do loci hitting the 97% allele frequency sum threshold have no 'meaningful' impact on FST-calculated LR's?"

In 2019 I co-authored a study presented at the American Academy of Forensic Sciences Annual Meeting demonstrating that this assertion that "the existence of such common alleles yields no helpful information" does not hold true in all circumstances [see Appendix 4].[24] We demonstrated that ten of the fifteen autosomal loci evaluated by FST could be subject to this locus-dropping behavior when observing from four to seven alleles at those loci. Non-exhaustive investigations into locus likelihood ratios "dropped" by this feature ranged from 0.29 (exclusionary) to 48.1

---

[23] United States v. Johnson, 15 Cr. 565 (VEC) (S.D.N.Y. Jan 13, 2017), Dkt. 100 at p. 50.

[24] Adams, N., Lorenz, S., Babaeianjelodar, M., Matthews, J., and Krane, D. "Quantifying the impact of post-validation modifications to Forensic Statistical Tool," American Academy of Forensic Sciences Annual Meeting, 2019.

(inclusionary). The ambiguity of the word "meaningful" makes it difficult to directly address the Government's assertion.

### 6.3.1.2.3    OCME response to IG complaint

In an October 18, 2017 letter, Florence Hutner, General Counsel to OCME, describes two post-validation modifications made to FST [see Appendix 5]:

> FST went online for casework in April 2011, following its approval for use by the Commission. Shortly thereafter, also in April 2011, some functions were updated by the programmers and a small, unrelated change was inadvertently made, causing OCME to take FST off-line. This change affected the way numbers were being sorted within two particular template ranges (6.25-12.5 picograms and 50-100 picograms), and the calculation of negative likelihood ratios. At that time, the total per-locus allele frequency was also capped at .97 to prevent the possibility of a negative likelihood ratio. The possibility of a negative likelihood ratio if the value of the allele frequency is not capped below 1 relates to the use of the minimum allele frequency as recommended by the NRCII report. In this circumstance, very rare alleles are given a frequency value as if they had been seen five times in the reference database of profiles". Because these circumstances are so rare, if this allele is present and it is given the minimum allele frequency, it is possible that the overall allele frequency at that location could add to a total greater than 1, which could result in a negative LR. By capping the frequency at .97, any locus where the sum of the allele frequencies total 0.97 or above will be given an LR=l, thereby rendering that location inconclusive with no weight being assigned to either an inclusion or an exclusion.

OCME's original FST validation study materials do not mention negative likelihood ratios. I have never observed a negative likelihood ratio calculated by FST. It is not clear to me under what circumstances a negative likelihood ratio is possible if this 0.97 allele frequency sum threshold is not implemented.

In describing the impact on LR's by this post-validation modification to FST, Hutner states:

Based on the performance check, all but two of the samples came up with identical LRs with the 0.97 total allele frequency cap. See Exhibit L, OCME FST Validation Study, Volume 24. The two samples that yielded slightly different LRs showed a difference between an LR of 0.34 using the pre-capped frequencies, and 0.42 with the frequency cap of 0.97. Similarly, with the second sample, the overall LR was $3.38 \times 10^4$ prior to the 0.97 cap, while the overall LR with the 0.97 modification was $3.82 \times 10^4$. Because those differences are within an acceptable range of variation, in that they do not change the qualitative conclusion, FST was determined to be suitable for use in forensic casework as of June 27, 2011.

This is an interesting definition of acceptance/qualification criteria – "Because those differences are within an acceptable range of variation, in that they do not change the qualitative conclusion, FST was determined to be suitable for use in forensic casework as of June 27, 2011." OCME uses a "verbal equivalent" scale to assign verbal qualifiers to likelihood ratio ranges:

| If the likelihood ratio is... | Then the evidence provides... |
| --- | --- |
| Less than 0.001 | Very strong support for $H_d$ over $H_p$ |
| 0.001 to 0.01 | Strong support for $H_d$ over $H_p$ |
| 0.01 to 0.1 | Moderate support for $H_d$ over $H_p$ |
| 0.1 to 1.0 | Limited support for $H_d$ over $H_p$ |
| 1 to 10 | Limited support for $H_p$ over $H_d$ |
| 10 to 100 | Moderate support for $H_p$ over $H_d$ |
| 100 to 1000 | Strong support for $H_p$ over $H_d$ |
| Greater than 1000 | Very strong support for $H_p$ over $H_d$ |

**Table 4.** Qualitative interpretation of likelihood ratios. Likelihood ratios provide a measure of the strength of support in favor of one hypothesis over the other. Let $H_p$ represent the prosecution hypothesis, or the hypothesis that the comparison sample **did** contribute to the sample. Let $H_d$ represent the defense hypothesis, or the hypothesis that the comparison sample **did not** contribute to the sample. Use the values suggested by Butler (2005, Forensic DNA Typing. Burlington, MA: Elsevier Academic Press, pp 513), as shown here, to describe the strength of support for either $H_p$ or $H_d$.

Table 1 – OCME Forensic Biology Protocols for Forensic STR Analysis, Forensic Statistical Tool (FST), effective June 20, 2016 at page 24.

Considering only the two changed values reported in the Quality Control Test for FST v2.0 summary and referenced by Hutner, no change in verbal scale is observed. LR's of 0.34 and 0.42 would both fall within the range of 0.1 to 1.0 or "Limited support for $H_d$ over $H_p$". LR's of 3.38E+04 (33,800) and 3.82E+04 (38,200) would both fall in the range of "Greater than 1,000" or "Very strong support for $H_p$ over $H_d$". However, the change in LR reported for the comparison of non-contributor MB3578, 0.43 to 29.29, is more than two orders of magnitude, changing an original FST-generated LR qualitative conclusion of "Limited support for $H_d$ over $H_p$" to "Moderate support for $H_p$ over $H_d$" upon analysis with FST v2.0. If not changing qualitative conclusions is an acceptance criterion applied to non-contributors, OCME's observed change in LR's for the non-contributor MB3578 comparison would violate that criterion.

It is worth noting that OCME uses a different verbal scale than what is recommended by SWGDAM.[25] For example, an LR of 5,000 would be reported as "very strong support" under OCME's scale but "moderate support" under SWGDAM's scale:

| *Table 1.* Scale of verbal qualifiers for reporting likelihood ratios | |
| --- | --- |
| *LR* for $H_p$ Support and 1/*LR* for $H_d$ Support | **Verbal Qualifier** |
| 1 | Uninformative |
| 2 – 99 | Limited Support |
| 100 – 9,999 | Moderate Support |
| 10,000 – 999,999 | Strong Support |
| ≥1,000,000 | Very Strong Support |

---

[25] Scientific Working Group on DNA Analysis Methods (2018). "Recommendations of the SWGDAM Ad Hoc Working Group on Genotyping Results Reported as Likelihood Ratios." pp. Available: https://www.swgdam.org/publications

Table 2 - Table 1 from Recommendations of the SWGDAM Ad Hoc Working Group on Genotyping
Results Reported as Likelihood Ratios, July 12, 2018. Available at -
https://www.swgdam.org/publications

### 6.3.1.3   Independent evaluations

#### 6.3.1.3.1    Matthews, et al. investigation

In 2019 my colleagues and I published a study that investigated the impact of the introduction of
this 0.97 allele frequency sum threshold.[26] We report that 104 of 439 (23.7%) two- and three-
person mixtures from the FST validation study had at least one locus whose allele frequencies
summed to 0.97 or higher, triggering the locus-dropping behavior. This resulted in different verbal
qualifier labels between versions in 2.9% of true contributor comparisons.

Due to difficulties in automating testing of FST, we limited the non-contributor portion of the
study to only 700 non-contributors and 40 mixtures, for a total of 28,000 non-contributor LR
comparisons. While this is, to my knowledge, the largest independent evaluation of FST to-date,
it involved only a fraction of the total comparisons from the original FST validation study.

#### 6.3.1.3.2    Gasston, et al. investigation

Also in 2019, a study by Gasston, et al., investigated expected LR calculations for loci exhibiting
five or six alleles whose frequencies would sum to 0.97 or greater, triggering removal from FST
LR calculations. They state:

> On average, the dropping of a locus is conservative for six-peak loci and
> nonconservative for five-peak loci. For persons of interest (POIs) with rare alleles, the
> dropping is usually conservative. For POIs with common alleles, the dropping of the

---

[26] Matthews, J. et al. (2019). "The Right To Confront Your Accusers: Opening the Black Box of
Forensic DNA Software," Proceedings of the 2019 AAAI/ACM Conference on AI, Ethics, and
Society, pp. 321–327.

locus is often nonconservative.[27]

I am not aware of any investigation into whether five-allele loci or six-allele loci are more commonly encountered in either the FST validation study data or in actual casework samples. Knowing those expected rates of occurrence could be useful in evaluating whether the impact of this modification to FST is, on average, conservative or anti-conservative.[28]

### 6.3.1.4   Impact on Sample "Swab 1b from the 'roll' of 'gray duct tape'"

Using allele frequency values extracted from FST database backups, I have summed frequencies for alleles observed in any of the three amplifications of "Swab 1b from the 'roll' of 'gray duct tape'" sample [see Appendix 6]. Observed allele frequencies exceed 0.97 for at least one subpopulation at loci CSF1PO, TH01, D16S539, and vWA. Observed allele frequencies exceed 1.0 for two subpopulations at the locus TPOX. This indicates that observed allele data are discarded by FST at five of the fifteen tested autosomal loci, leaving only ten loci for use in LR calculations.

I am not aware of any analysis by OCME or by independent researchers on the expected performance of the fifteen-locus FST system on ten-locus samples, e.g. expected distributions of LR's for true contributors or non-contributors or specificity and sensitivity rates.

### 6.3.2   Template amounts (for interpolation)

In the same October 18, 2017 letter, Florence Hutner describes a change made to sorting template

---

[27] Gasston, J., Kruijver, M., Curran, J.M., Bright, J., Pugh, S., and Buckleton, J.S. (2020) "An examination of aspects of the probabilistic genotyping tool: Forensic Statistical Tool," WIREs Forensic                       Sci.                       2(3):1–6.                       Available: https://wires.onlinelibrary.wiley.com/doi/epdf/10.1002/wfs2.1362

[28] Conservative: "favoring the defendant. A conservative estimate is deliberately chosen to be more favorable to the defendant than the best (unbiased) estimate would be."   National   Research Council (1996). *The Evaluation of Forensic DNA Evidence*. pp. 1-272. Available: https://www.nap.edu/catalog/5141/the-evaluation-of-forensic-dna-evidence

values:

> Shortly thereafter, also in April 2011, some functions were updated by the programmers and a small, unrelated change was inadvertently made, causing OCME to take FST off-line. This change affected the way numbers were being sorted within two particular template ranges (6.25-12.5 picograms and 50-100 picograms), and the calculation of negative likelihood ratios.

I have not received documentation describing the inadvertent change to template range value sorting, which I expect to describe why a change was made in the first place, how tests were planned, what tests were conducted, how the change could affect casework despite having been tested, and how the change was reverted.

### 6.3.3   Code consolidation

In addition to the template range value sorting change, Hutner states in her letter, "Shortly thereafter, also in April 2011, some functions were updated by the programmers…"

A document entitled "Quality Control Test of Forensic Statistical Tool (FST) Version 2.5 Production Site" and dated May 13, 2013 also states:

> FST was upgraded to version 2.5 between January 2013 and May 2013. Upgrades included code consolidation and testing, addition of new likelihood ratio scenarios, improvements in efficiency, new administrator functions, cosmetic improvements, and expansion to allow for new STR kits with additional loci.

I have received no documentation describing the 2011 or 2013 modifications, including what functions were updated or consolidated, why they were updated, how they were updated, how tests were planned, what tests were conducted, and whether any changes to the functionality of FST (i.e. LR calculations) were observed as a result of the updates and consolidation.

33

### 6.3.4   Allele designation

The same Quality Control Test summary for FST v2.5 states:

> During code consolidation, a bug in the code was noted. This bug could cause a false match between alleles of the form x and 1x or 2x. For example, if a suspect carried an '8' allele at a particular locus and an '18' allele appeared in the evidence at that locus, the 8 could be incorrectly matched to the 18. Alleles such as 9 and 9.3 would not be mismatched.

> There are only a few STR loci where such a mismatch could happen. In every instance, the two alleles required are extremely rare, each with estimated frequency less than 0.01. All casework FST results that were stored on the Forensic Biology network in suspect or evidence files were examined for the presence of alleles that could be mismatched. No such pairs were found. Thus, this bug did not affect any casework results stored on the network in suspect or evidence files.

I have received no documentation describing testing efforts to determine the possible impact of this defect. This summary does not state the quantity of FST results that were stored on the network – 10? 100? This summary does not mention any investigation into the 2010 FST validation study data to identify whether any validation study comparisons were affected by the defect – or if the defect was even present at the time of the 2010 validation study or if it was introduced sometime between 2010 and 2013. I have requested but not received all past versions of the FST source code.

### 6.3.5   Performance checks versus re-validation

SWGDAM guidance states, "A significant change(s) to the software, defined as that which may impact interpretation or the analytical process, shall require validation prior to implementation."

ISFG guidance states, "Core changes to the implemented algorithms should be subjected to additional developmental validation prior to their release."

ASB Std 018 states, "Software modifications that may impact the analytical process, interpretation,

or reported result(s) shall be evaluated as to the extent of the impact to determine whether a validation or performance check is required prior to implementation."

None of these documents specifies whether *any* change to LR calculations in a probabilistic genotyping system necessitates a re-validation of the system. Therefore, defining re-validation criteria falls to the lab.

# 7  Conclusions

I have not seen materials demonstrating that the original development or continued maintenance of FST comports with common software engineering practices such as establishing requirement specifications (including falsifiable acceptance criteria for testing), establishing test plans, or conducting measures of software development materials or practices that could support claims that FST is verified or validated.

In 2011, within weeks of bringing FST online for casework, the live system was functionally changed through an introduction of at least one defect and subsequently taken offline for three months, during which at least one additional functional modification was made to the system – the introduction of dropping loci whose allele frequencies sum to ≥0.97 for one or more subpopulations. Following these changes, only two samples affected by locus-dropping were re-evaluated by OCME personnel. Both of these samples were subject to removal of only a single locus each. OCME claims that this functional modification affected LR calculations within "an acceptable range of variation" because verbal qualifiers of LR's calculated by the original and post-validation FST versions did not change. This is not the case when considering OCME's own data from its 2011 Quality Control Test non-contributor comparisons. Nor is it the case for true contributors, as described by Matthews, et al. Independent examinations of this behavior in 2019 by Adams, et al., Matthews, et al., and Gasston, et al., increased insight into the circumstances under which this locus-dropping modification can be triggered and the average impact of dropped loci on LR's, but these studies are not re-validations of FST.

This locus-dropping modification affects which profile data generated during the course of testing "swab 1b from the 'roll' of 'gray duct tape'" would be considered by the original, non-locus-

dropping, version of FST, and the functionally different FST versions v2.0 or v2.5.

Additional functional modifications to FST, including interpolating dropout rates from template quantities and parsing of allele designations could affect system performance (e.g. LR calculations and sensitivity/specificity). Other modifications to FST, including "updates" and "code consolidation," are not described in any documentation provided to me. Consequently, it is not clear to me whether these modifications are functional or non-functional and, if functional, the rate and significance of impact on LR calculations. Since the rate and significance of past defects can be used to assess software quality and predict the probability of detecting defects in the future, additional information on these changes to FST are of special interest.

Since significant portions of the FST software cannot be verified due a lack of acceptance criteria usable for testing, and since it has been functionally modified since its 2010 validation study, I consider FST unverified and unvalidated. FST likelihood ratio calculations should not be relied upon as representative of the models published in Mitchell, et al. or described in its 2010 validation study materials.

Dated:   August 5, 2021
         Fairborn, Ohio                         Nathaniel D. Adams

# Table of Appendices:

1. **The Software Development Process**

2. **IEEE "risk-based, integrity-level scheme"**

3. **Program complexity**

4. **Adams, N., Lorenz, S., Babaeianjelodar, M., Matthews, J., Krane, D. (2019). "Quantifying the impact of post-validation modifications to Forensic Statistical Tool." Oral presentation. 71st Annual Meeting of the American Academy of Forensic Sciences. February 21, 2019. Baltimore, MD.**

5. **October 18, 2017 letter Re: Allegations by Legal Aid Society/Federal Defenders of New York to the Honorable Catherine Leahy-Scott, NYS Inspector General (September 1, 2017)**

6. **Swab 1B from "'roll' of 'gray duct tape'" locus allele frequency sums worksheet**

# Appendix 1

# The Software Development Process[1]

The Software Development Process is composed of a series of steps, which are generally divided into:

1. Requirements – What the program should do, generally written in English and including visuals where applicable.
2. Specification – What the program should do, generally written in a combination of technical English and mathematical notation, with diagrams where applicable. A precise, technical description of the Requirements.
3. Design – How the program should perform the tasks specified in the Requirements and Specification documents, generally written in a combination of technical English, pseudocode[2], and diagrams, where applicable. This is the structure of the program with descriptions of how its components fit together.
4. Implementation – Translation of the design to a programming language.
5. Testing – Verification that the program produced by the Implementation stage adheres to the tasks described in Requirements and Specifications.
6. Maintenance – Upkeep of the program, including fixes for errors ("bugs") as well as additions of new features or revisions of current features.

The Software Development Process is a cyclical process – non-trivial programs invariably require revisiting earlier stages of the process. There are many good reasons for revisiting earlier stages of the process: when prior assumptions turn out to be invalid or incomplete; requirements change; technologies change; users request a change; a process can be improved; or performance can be improved.

---

[1] Software development process: "the process by which user needs are translated into a software product

NOTE The process involves translating user needs into software requirements, transforming the software requirements into design, implementing the design in code, testing the code, and sometimes, installing and checking out the software for operational use. These activities may overlap or be performed iteratively." (ISO/IEC/IEEE, "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E), vol. 2010.)

[2] Pseudocode: "A notation resembling a simplified programming language, used in program design; esp. (a) one that is translated by a computer into a programming language; (b) one consisting of expressions in natural language syntactically structured like a programming language, used to represent programs that are later written by a programmer." (Oxford English Dictionary)



Figure 1-1 - The Software Design Process, (Adams, N. and Krane, D (2016). "Black boxes and due process: Transparency in expert software systems". Oral presentation. 68th Annual Meeting of the American Academy of Forensic Sciences. Las Vegas, Nevada)

# Appendix 2

# IEEE "risk-based, integrity-level scheme"

| Integrity level | Description |
|:---:|:---|
| 4 | An error to a function or system feature that causes the following:<br><br>— Catastrophic consequences to the system with reasonable, probable, or occasional likelihood of occurrence of an operating state that contributes to the error<br><br>or<br><br>— Critical consequences with reasonable or probable likelihood of occurrence of an operating state that contributes to the error |
| 3 | An error to a function or system feature that causes the following:<br><br>— Catastrophic consequences with occasional or infrequent likelihood of occurrence of an operating state that contributes to the error<br><br>or<br><br>— Critical consequences with probable or occasional likelihood of occurrence of an operating state that contributes to the error<br><br>or<br><br>— Marginal consequences with reasonable or probable likelihood of occurrence of an operating state that contributes to the error |
| 2 | An error to a function or system feature that causes the following:<br><br>— Critical consequences with infrequent likelihood of occurrence of an operating state that contributes to the error<br><br>or<br><br>— Marginal consequences with probable or occasional likelihood of occurrence of an operating state that contributes to the error<br><br>or<br><br>— Negligible consequences with reasonable or probable likelihood of occurrence of an operating state that contributes to the error |
| 1 | An error to a function or system feature that causes the following:<br><br>— Critical consequences with infrequent likelihood of occurrence of an operating state that contributes to the error<br><br>or<br><br>— Marginal consequences with occasional or infrequent occurrence of an operating state that contributes to the error<br><br>or<br><br>— Negligible consequences with probable, occasional, or infrequent likelihood of occurrence of an operating state that contributes to the error |

Table 2-1 – "Assignment of integrity levels" from Annex B of *IEEE Standard for System and Software Verification and Validation*

| Consequence | Definition |
|---|---|
| Catastrophic | Loss of human life, complete mission failure, loss of system security and safety, or extensive financial or social loss. |
| Critical | Major and permanent injury, partial loss of mission, major system damage, or major financial or social loss. |
| Marginal | Severe injury or illness, degradation of secondary mission, or some financial or social loss. |
| Negligible | Minor injury or illness, minor impact on system performance, or operator inconvenience. |

Table 2-2 – "Definition of consequences" from Annex B of *IEEE Standard for System and Software Verification and Validation*

# Appendix 3

# Program complexity



Figure 3-1 – A program with three decision statements (D1, D2, D3), each with left (True) and right (False) branches. Branches 1-6 are instructions executed whenever the program enters that branch, based on the previous decision made. This program has six branches but eight unique paths. An addition of a fourth decision statement (not pictured) after D3 would increase the number of branches to 8 (2 x 4) but the number of possible paths to 16 ($2^4$). See [Figure 3-2 and Figure 3-3] for examples of path execution.



Figure 3-2 – This is the same program as in [Figure  and Figure ]. One of the eight possible paths through this program is highlighted in red. The dotted line indicates the path of execution. Branches 1, 3, and 5 are sequentially executed, and the program never enters Branches 2, 4, or 6.



Figure 3-3 – This is a second unique path possible for this program to execute, highlighted in red and indicated by the dotted line. Branches 1, 3, and 6 are sequentially executed, and the program never enters Branches 2, 4, or 5.

# Appendix 4

# Quantifying the impact of post-validation modifications to Forensic Statistical Tool

Nathaniel Adams, Stephen Lorenz, Marzieh Babaeianjelodar, Jeanna Matthews, and Dan Krane

adams@bioforensics.com

# Timeline

- 2010 Dec - Approval
- 2011 Apr - Online
- 2011 Apr - Offline
- 2011 Apr-Jun - Modifications
- 2011 Jul - Online
- 2016 Oct - Independent report
- 2017 Jan - Acknowledgement
- 2017 Oct - Protective order vacated

# Validation, 2010

Mitchell, et al. "Validation of a DNA mixture statistics tool incorporating allelic drop-out and drop-in"

454 mock evidence samples compared to:

- Each true contributor
- >1,200 non-contributors

| Range | Verbal scale |
|---|---|
| 1 to 10 | Limited |
| 10 to 100 | Moderate |
| 100 to 1,000 | Strong |
| >1,000 | Very strong |

A. A. Mitchell, J. Tamariz, K. O'Connell, N. Ducasse, Z. Budimlija, M. Prinz, and T. Caragine, "Validation of a DNA mixture statistics tool incorporating allelic drop-out and drop-in," Forensic Sci. Int. Genet., vol. 6, no. 6, pp. 749–761, 2012.

5/2N

Adjustments for minimum allele frequency led to circumstances where allele frequencies sum to >1.0, example:

8, 9, 10, 11, 12 = 0.992

Any 6th allele: >1.0

https://github.com/propublica/nyc-dna-software/

| Caucasian TPOX allele | Frequency |
|---|---|
| 0 | 0.017 |
| 6 | 0.021 |
| 7 | 0.021 |
| 8 | 0.624 |
| 9 | 0.12 |
| 10 | 0.037 |
| 11 | 0.174 |
| 12 | 0.037 |
| 13 | 0.021 |
| Sum | 1.072 |

# 2011 April-June

FST is taken offline for casework. Modifications are made to correct at least two defects, including the allele frequencies issue. Algorithmic change introduced:

Sum allele frequencies observed in evidence for each subpop (Asian, Black, Cau., His.)

IF sum of allele frequencies in any subpopulation ≥ 0.97

      THEN drop locus from LR calculation for all subpops

# 2011 April-June

12 of 454 validation study mixtures are evaluated for effects of this change.

2 of these 12 mixtures exhibit locus-dropping behavior

1 of these 2 demonstrates an increase in false-positive LR's and in false-positive verbal scale labels

New York City Office of the Chief Medical Examiner, "Quality Control Test of Forensic Statistical Tool (FST) Version 2.0" June, 2011.

# Investigation 2016-now

1. Modification identified

2. All validation study mixtures evaluated against known contributors (no assumed contributors under H2)

3. 40 2- and 3-person mixtures evaluated against known non-contributors

4. Allele combinations triggering locus-dropping identified

# Identification of modification

- Comparison of LCN 3-person "touch" sample to non-contributors (Butler, et al. 2003)

- Pre-modification highest adventitious match to "JB" LR=157
  - Post-modification: 70.6
  - 3 loci dropped
    - D3: 0.534
    - D13: 3.13
    - D16: 1.33

- Function "CheckFrequencyForRemoval()" identified

OCME, NYC, Dept Forensic Biology. "Forensic Statistical Tool Validation." 2010.

# Comparison to known contributors with and without CheckFrequencyForRemoval

23.7% of evaluations experienced locus-dropping

~3% of known contributor LR's changed verbal scale labels

With locus-dropping:
- 1 more true inclusion
- 3 more false exclusions

| | | | FST v2.5 with CheckFrequencyForRemoval | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Support for Hd | | | | LR = 1 | Support for Hp | | | | | | | |
| | | | Very strong | Strong | Moderate | Limited | Inconclusive | Limited | Moderate | Strong | Very strong | | | |
| FST v2.5 with CheckFrequencyForRemoval disabled | Support for Hd | Very strong | 186 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 186 | 14.9% | 20.5% |
| | | Strong | 3 | 20 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 1.9% | |
| | | Moderate | 2 | 4 | 19 | 1 | 0 | 0 | 0 | 0 | 0 | 26 | 2.1% | |
| | | Limited | 0 | 0 | 2 | 16 | 0 | 1 | 0 | 0 | 0 | 19 | 1.5% | |
| | LR = 1 | Inconclusive | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% | 0.0% |
| | Support for Hp | Limited | 0 | 0 | 1 | 2 | 0 | 24 | 4 | 0 | 0 | 31 | 2.5% | 79.5% |
| | | Moderate | 0 | 0 | 0 | 0 | 0 | 1 | 34 | 3 | 0 | 38 | 3.1% | |
| | | Strong | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 57 | 2 | 65 | 5.2% | |
| | | Very strong | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 853 | 856 | 68.8% | |
| | | | 191 | 24 | 23 | 19 | 0 | 26 | 45 | 62 | 855 | 1,245 | | |
| | | | 15.3% | 1.9% | 1.8% | 1.5% | 0.0% | 2.1% | 3.6% | 5.0% | 68.7% | | | |
| | | | 20.6% | | | | | 79.4% | | | | | | |

57

# Comparison to known contributors with and without CheckFrequencyForRemoval

0.4% of non-contributor LR's changed verbal scale labels

1/1,000 ≤ LR ≤ 1,000: 17.5% changed verbal scale labels

With locus-dropping:
- 4 more false inclusions
- 5 more true exclusions

| | | | FST v2.5 with CheckFrequencyForRemoval | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Support for Hd | | | | LR = 1 | Support for Hp | | | | | | |
| | | | Very strong | Strong | Moderate | Limited | Inconclusive | Limited | Moderate | Strong | Very strong | | | |
| FST v2.5 with CheckFrequencyForRemoval disabled | Support for Hd | Very strong | *27,705* | 13 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 27,719 | 99.0% | 99.9% |
| | | Strong | 42 | *100* | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 151 | 0.5% | |
| | | Moderate | 9 | 6 | *49* | 9 | 0 | 1 | 0 | 0 | 0 | 74 | 0.3% | |
| | | Limited | 0 | 1 | 8 | *20* | 0 | 3 | 0 | 0 | 0 | 32 | 0.1% | |
| | LR = 1 | Inconclusive | 0 | 0 | 0 | 0 | *0* | 0 | 1 | 0 | 0 | 1 | 0.0% | 0.0% |
| | Support for Hp | Limited | 2 | 0 | 1 | 2 | 0 | *8* | 5 | 0 | 0 | 18 | 0.1% | 0.1% |
| | | Moderate | 0 | 0 | 0 | 0 | 0 | 2 | *1* | 1 | 0 | 4 | 0.0% | |
| | | Strong | 0 | 0 | 0 | 0 | 0 | 0 | 0 | *0* | 0 | 0 | 0.0% | |
| | | Very strong | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | *1* | 1 | 0.0% | |
| | | | 27,758 | 120 | 68 | 31 | 0 | 14 | 7 | 1 | 1 | 28,000 | | |
| | | | 99.1% | 0.4% | 0.2% | 0.1% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | | | |
| | | | 99.9% | | | | | 0.1% | | | | | | |

# Loci with N-allele combinations invoking locus-dropping

| # alleles | D8 | D21 | D7 | CSF | D3 | TH01 | D13 | D16 | D2 | D19 | vWA | TPOX | D18 | AMEL | D5 | FGA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | | | | | | | | | | | | ■ | | | | |
| 5 | | | | ■ | ■ | ■ | | ■ | | | | ■ | | | ■ | |
| 6 | | | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | | | | ■ | |
| 7 | ■ | | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | | | | ■ | |

59

# US v. Kevin Johnson

"FST disregards the information from any locus in a sample if the alleles present at that locus reflect 97% or more of the alleles in the overall population for that locus. It does so because <u>the existence of such common alleles yields no helpful information</u>." [emphasis added]

**-Opp to Def Motion to Exclude Evidence Produced by FST and for a Daubert Hearing, 13 Jan 2017**

# "The existence of such common alleles yields no useful information"

More true:

TPOX: 6, 8, 9, 10, 11, 12

    Asian: 1.016

    Black: 0.984

    Caucasian: 1.013

    Hispanic: 0.996

Max difference:

    Asian - Black = 0.032

    1.0 - Black= 0.016

Less true:

D13: 9, 10, 11, 12, 13, 14

    Asian: 0.720

    Black: 0.980

    Caucasian: 0.839

    Hispanic: 0.901

Max difference:

    Black - Asian = 0.260

# Most extreme disparities in allele frequency sums for N-allele combinations (no '0' allele)

| # Alleles | Locus | Alleles | Disparity |
|-----------|-------|---------|-----------|
| 4 | TPOX | 8, 9, 10, 11 | 0.070 |
| 5 | TPOX | 7, 8, 9, 11, 12 | 0.128 |
| 6 | D13 | 7, 9, 11, 12, 13, 14 | 0.428 |
| 7 | D13 | 6, 7, 11, 12, 13, 14, 15 | 0.530 |

# Disabling "CheckFrequencyForRemoval" in an extreme case (Black − Asian = 0.26)

Comparison profile at D13: (9, 10)

    RMP (2pq) for Asian subpop.: 0.046 or 1 in 22

    RMP (2pq) for Black subpop.: 0.00144 or 1 in 694

Evidence:   2x replicates each showing (9, 10, 11, 12, 13, 14)

| LR: | Asian | Black | Caucasian | Hispanic |
|-----|-------|-------|-----------|----------|
|     | 1.45  | 48.1  | 16.15     | 5.09     |

# Disabling "CheckFrequencyForRemoval" in an extreme case (Black − Asian = 0.26)

Comparison profile at D13: (8, 12)

    RMP (2pq) for Asian subpop.: 0.079 or 1 in 13

    RMP (2pq) for Black subpop.: 0.015 or 1 in 66

Evidence:  1x replicate showing (9, 10, 11, 12, 13) [8 absent]

          1x replicate showing (8, 9, 10, 11, 13)   [12 absent]

| LR: | Asian | Black | Caucasian | Hispanic |
|-----|-------|-------|-----------|----------|
|     | 0.33  | 0.4   | 0.29      | 0.38     |

# Quantifying the impact of post-validation modifications to Forensic Statistical Tool

Nathaniel Adams, Stephen Lorenz, Marzieh Babaeianjelodar, Jeanna Matthews, and Dan Krane

adams@bioforensics.com

# Appendix 5



**Florence Hutner, General Counsel**
421 E. 26th Street, New York, NY 10016
Telephone: 212.323.1901   Fax: 646.500.5583
Email:  fhutner@ocme.nyc.gov
Official Website: www.nyc.gov/ocme

October 18, 2017

Brian Gestring
Director, Office of Forensic Service
NYS Division of Criminal Justice Service
80 South Swan Street
Albany, NY 12210
forensiclabs@dcjs.ny.gov

> Re:   Allegations by Legal Aid Society/Federal Defenders of New York to the
>       Honorable Catherine Leahy-Scott, NYS Inspector General (September 1, 2017)

Dear Mr. Gestring:

The New York City Office of Chief Medical Examiner (OCME) appreciates this opportunity to respond to the above-captioned allegations of the Legal Aid Society and Federal Defenders of New York (LAS/FD) submitted to the NYS Inspector General, dated September 1, 2017 (the LAS/FD Allegations). As directed in your letter of September 20, 2017, to Timothy Kupferschmid, Chief of Laboratories for OCME, we are submitting our response to the email address noted above for review by the New York State Commission on Forensic Science (the Commission); please let us know if you would like additional electronic or hard copies of this response or any of the referenced exhibits forwarded to any other location.

Contrary to the erroneous and exaggerated assertions in the LAS/FD Allegations, OCME's Department of Forensic Biology has not engaged in "serious malfeasance" or "negligent conduct," nor has it relied on "unsound statistical evidence" in the validation or implementation of its Low Copy Number (LCN) DNA testing analysis or of its Forensic Statistical Tool (FST). Rather, as detailed below, both of these tools were carefully developed and validated, and both were approved by the Commission after review and approval by the panel of experts who sit on the Commission's DNA Subcommittee. Indeed, LCN was essentially approved twice, the second time following the referral of specific concerns raised by certain Commissioners to the Subcommittee. Additionally, as also discussed below, both tools have also been approved, or simply admitted, in more than 45 criminal proceedings, in both state and federal courts, as well as specifically requested on occasion by members of the criminal defense bar.

As elaborated below, LAS/FD misstate facts and grossly inflate the issues that they claim constitute "alarming misconduct" by OCME. Contrary to their assertions, for example, FST did not experience a "significant malfunction"; rather, a minor modification was made to prevent an artifact from causing obviously incorrect answers (negative likelihood ratios, which cannot exist in the statistical context of the program). Nor did OCME ever manipulate data or make false statements to the Commission or to anyone else about its testing methodologies. Rather, critical differences in language have been ignored, at minimum, leading to false accusations and unwarranted personal attacks.

In fact, OCME has always been entirely forthcoming with the Commission as it has with its other accrediting bodies. OCME made multiple presentations to explain its then new technologies, answered all questions asked of it, and made its complete validation studies available to the DNA Subcommittee as often as requested. Additionally, those studies were made available to defense counsel starting in at least 2012 in the context of criminal matters.

Apparently, having lost their battle against the science in nearly all courts of law and before this Commission, LAS/FD have disingenuously dressed up their flawed scientific arguments as a new assertion of "malfeasance," in a weak attempt to create jurisdiction for the NYS Inspector General to review what amounts to a question of science and scientific protocols. Now that the LAS/FD Allegations have been referred to the Commission, these fallacious arguments should finally be laid to rest.

## A. FST, Duly Approved by the Commission, Remains Scientifically Valid

### 1. OCME's Forensic Statistical Tool is Effective and Generally Accepted in the Scientific Community

OCME developed its FST software to enable the calculation of likelihood ratios (LRs) for samples involving two- and three-person mixtures where parts or all of the contributors are non-deducible. Although no other tool was available in the United States to conduct such an analysis at the time FST was developed, FST's methodology is neither "novel" nor "controversial." FST itself was based on a product called LoComatioN used by the Forensic Science Service in the United Kingdom; moreover, another probabilistic genotyping tool that has been widely used, True Allele, had been approved at the time FST was introduced into casework. Further reflecting that the FST's methodology is not "novel", it has been accepted by nearly all courts that have addressed the issue. *See* Exhibit A, List of State Court Decisions Admitting FST in Criminal Cases.

In seeking to demonstrate the purported novelty of FST, LAS/FD rely on the recent report of the President's Council of Advisors on Science and Technology (PCAST), "Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature Comparison Methods" (the "PCAST Report"). That reliance, however, is unavailing, as PCAST is widely criticized by scientists as politically motivated and scientifically unsound, and its report is generally discredited. Many shortcomings of the PCAST Report, including its failure to reflect the view of the forensic science community, are evident in the lengthy open letter of Dr. Bruce Budowle, an

expert who frequently testifies on behalf of criminal defendants. *See* Exhibit B, Letter of Bruce Budowle, "To whom it may concern," (June 17, 2017). Dr. Budowle not only notes the absence from the PCAST Report of any data or other indication that PCAST reviewed or tested any probabilistic genotyping programs, but he lists multiple other inadequacies as well. As he wrote:

> When the President's Council of Advisors on Science and Technology (PCAST) Report first was published in 2016, it was obvious that the report was not particularly helpful from a scientific perspective as it was myopic, full of error, and did not provide data to support its contentions. A more significant concern regarding the failings of the PCAST Report was that it claimed its focus was on science, but obviously was dedicated substantially to policy. Initially I considered writing a critique about the failings of the PCAST Report to assist the community. But the problems with this report were so obvious that I did not think it would be necessary to devote time to such an effort. Indeed my prediction was correct in that the report would be (and has been) rejected by the scientific community as well as overwhelmingly by the courts.

*Id.; see also* Exhibit C, Open Letter of John Buckleton (May 26, 2017), also available at https://johnbuckleton.wordpress.com/pcast/ ("insufficient research was undertaken by the committee. The conclusions of the committee are incorrect and need to be revisited.")[1]

As discussed further below, FST has been approved by the relevant scientific accrediting bodies, notably the Commission and the DNA Subcommittee. FST was also reviewed by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board (ASCLD/LAB), now ANAB, and the overwhelming majority of courts that have considered its validity and admissibility have accepted it. Further, although OCME has recently replaced this tool with more advanced software developed since FST came online, OCME continues to stand by the validity of its FST analysis. OCME's decision to upgrade to a commercially available software called STRMix reflects advances in DNA forensic science and the enhancement of the Federal Bureau of Investigations (FBI) National DNA Index System, not any loss of or reduction in our confidence of the FST program.

FST uses a standard analytical procedure grounded in PCR-STR DNA testing and Bayesian statistics to calculate LRs. One of its critical components is the ability to incorporate

---

[1] *See also, e.g.:*

☐ Morrison, Geoffrey Stewart, et al., "Letter to the Editor: A comment on the PCAST report: Skip the 'match;/'non-match' stage", *Forensic Science International* 272 (2017) at e7;

☐ American Society of Crime Lab Directors: pceinc.org/wp-content/uploads/2016/10/20160930-Statement-on-PCAST-Report-ASCLD.pdf

☐ Association of Firearm and Tool Mark Examiners: afte.org/uploads/documents/AFTE-PCAST-Response.pdf

☐ Bureau of Alcohol, Tobacco, Firearms and Explosives:
www.theiai.org/president/20160921_ATF_PCAST_Response.pdf

☐ Federal Bureau of Investigation: www.fbi.gov/file-repository/fbi-pcast-response.pdf

☐ International Association for Identification: www.theiai.org/president/IAI_PCAST_Response.pdf

☐ National District Attorneys Association:
www.ciclt.net/ul/ndaajustice/PCAST/NDAA%20PCAST%20Response%20FINAL.pdf

allelic drop-out and drop-in, by assigning a weight to a comparison between an evidence profile and a reference profile when one or more of the reference profile alleles are not detected in the mixture or when additional alleles were detected.

FST can be used when a DNA analyst compares a reference profile with the profile or profiles contained in what has previously been determined to be either a two- or three-person mixture from a forensic sample.[2] Before FST is used to calculate an LR for the comparison to the sample, the analyst must first manually determine if the reference sample is included as a possible contributor to the mixture. *See* Exhibit E, OCME, *Forensic Biology Protocols for Forensic STR Analysis*, STR Results Interpretation (7/11/2016); Forensic Statistical Tool (FST) (6/20/2016). That LR considers the probability of two separate hypotheses being true. Hypothesis A is the probability that the mixture contains the suspect's DNA. Hypothesis B considers the probability that the suspect is not a contributor to the mixture. Statistical tools like FST which calculate LRs are intended only to determine the *likelihood* of a particular outcome; they are not and never were aimed at determining with 100% certainty whether an individual is actually a contributor to a forensic sample. FST refines its estimate by taking into account several important factors including the drop-in/drop-out rates, and the possibility that the alleles in the sample could have been provided from another individual in the population based on estimated allele and genotypic frequencies. *See* Exhibit F, Adele A. Mitchell, *et al.*, "Validation of a DNA Mixture Statistics Tool Incorporating Allelic Drop-Out and Drop-In," *Forensic Science International* (2012).

Based on the extensive validation studies performed on FST, as well as the tool's reliance on well-established and accepted scientific and statistical methods, PCR-STR DNA testing and Bayesian statistics, the program was approved for casework by the DNA Subcommittee and the Commission, and has been upheld as reliable in more than 32 state courts. *See* Exhibit G, Letter from Jack Ballantyne to Sean Byrne (Oct. 29, 2010); Exhibit H, Letter from Sean M. Byrne to Mechthild Prinz (Dec. 16, 2011)[3]; Exhibit A, *supra*.[4] Additionally, the National Forensic Science Technology Center reviewed FST as part of an external audit.

### 2. The FST Computer Source Code is Reliable and Functions as Intended

Having essentially failed to prevent OCME's use of FST in court, *see supra* n.4, defense counsel began to challenge the computer code that runs the FST tool. The first such challenge came in the matter of *United States v. Johnson*, 15 Cr. 565 (VEC) (SDNY 2015). Federal

---

[2] FST is not validated for use in casework where the number of contributors to the mixture is determined to be greater than three. *See* Exhibit D, OCME FST Validation Study Executive Summary, p. 5.

[3] Although this letter is dated December 16, 2011, the Commission acknowledged in its letter that FST was approved at the meeting held on December 7, 2010.

[4] Only one judge has precluded FST. *See, e.g., People v. Jaquan Collins*, 49 Misc.3d 595 (NY Sup Ct Kings Cty 2015) (Dwyer, J.). Since then, no other court in New York State has followed that decision. Indeed, various other courts have expressly declined to follow it, even questioning the objectivity of the critics called to testify in *Collins*. *See People v. Donsha Carter*, Ind. No. 2573/2014 (NY Sup Ct. Queens Cty, Jan. 12, 2016) ("Given what this court perceives to be a possible lack of objectivity guiding the testimony of several of the defense experts in *Collins*, this court is satisfied that *FST is generally accepted in the relevant scientific community*" (emphasis added)).

Defenders were granted access to the source code in that criminal matter, subject to a protective order.[5] Federal Defenders hired Nathaniel Adams, then a graduate student with a Bachelor's Degree in Computer Science from Wright University, to evaluate and review the code. Although Mr. Adams' report asserts that the code contains fatal flaws, in fact the only concerns that he raises are essentially cosmetic and stylistic in nature. *See* Exhibit J, Affidavit of Naeem Ullah, *People v. Jackson* (NY Sup Ct NY Cty), Ind. 727/2017 July 11, 2017). For example, Adams objects to the style and form of the coders' comments to the code, and to the names of certain variables, neither of which affects the operation of the code in any way. *See id.* ¶¶ 12, 13.

In fact, the effectiveness of the computer code is demonstrated by the fact that it generates the results that are expected based on the known inputs in the validation studies. *See id.* ¶¶ 12-15. Accordingly, the attack on the computer code must fail. Indeed, as described in more detail below, Adams' criticisms are irrelevant, and it is demonstrably false that "the application of the FST software includes functions that do not reflect, and are even counter to, the methodology as described by OCME." *See* LAS/FD Allegations at 3.

### 3. *OCME's Modification of FST Was Limited and Appropriate*
#### a. *The Minor Modification of FST Did Not Have a Consequential Effect on Analytical Results*

FST went online for casework in April 2011, following its approval for use by the Commission. Shortly thereafter, also in April 2011, some functions were updated by the programmers and a small, unrelated change was inadvertently made, causing OCME to take FST off-line. This change affected the way numbers were being sorted within two particular template ranges (6.25-12.5 picograms and 50-100 picograms), and the calculation of negative likelihood ratios. At that time, the total per-locus allele frequency was also capped at .97 to prevent the possibility of a negative likelihood ratio. The possibility of a negative likelihood ratio if the value of the allele frequency is not capped below 1 relates to the use of the minimum allele frequency as recommended by the NRCII report. In this circumstance, very rare alleles are given a frequency value as if they had been seen five times in the reference database of profiles".[6] Because these circumstances are so rare, if this allele is present and it is given the minimum allele frequency, it is possible that the overall allele frequency at this location could add to a total greater than 1, which could result in a negative LR. By capping the frequency at .97, any locus where the sum of the allele frequencies total 0.97 or above will be given an LR=1, thereby rendering that location inconclusive with no weight being assigned to either an inclusion or an exclusion.

---

[5] Recently, the news outlet ProPublica filed a motion in federal court before Judge Valerie Caproni, requesting that the protective order be lifted so that the code could be further reviewed. OCME took no position with respect to their motion to intervene and did not oppose lifting that protective order.

[6] *See* National Research Council (1996) *DNA technology in forensic science.* National Academy Press, Washington, DC (1996); *The evaluation of forensic DNA evidence.* National Academy Press, Washington, DC; Butler, John, *Fundamentals of Forensic DNA Typing* (1st Edition).

Contrary to the claim made by LAS/FD that this change always benefits the government's hypothesis, by invoking this cap and giving that locus an LR value of 1, either side can "benefit" depending on the alleles present in the mixture and in the reference sample. If the alleles of the reference sample are not seen in the mixture, then capping the locus could slightly benefit the prosecution. If the alleles of the reference sample are seen in the mixture, this could slightly benefit the defense. Regardless, this capping is done based on the alleles present in the mixture and in essence has nothing to do with the alleles of the reference sample.

Following this cap to the per locus total allele frequency, a complete performance check was conducted on that portion of the FST. That performance check consisted of 14,976 comparisons: 1,246 non-contributor comparisons, otherwise known as false positives, and two contributor comparisons for each of 12 samples. *See* Exhibit K, Quality Control Test of Forensic Statistical Tool (FST) Version 2.0 (June 30, 2011). Based on the performance check, all but two of the samples came up with identical LRs with the 0.97 total allele frequency cap. *See* Exhibit L, OCME FST Validation Study, Volume 24. The two samples that yielded slightly different LRs showed a difference between an LR of 0.34 using the pre-capped frequencies, and 0.42 with the frequency cap of 0.97. Similarly, with the second sample, the overall LR was $3.38 \times 10^4$ prior to the 0.97 cap, while the overall LR with the 0.97 modification was $3.82 \times 10^4$. Because those differences are within an acceptable range of variation, in that they do not change the qualitative conclusion, FST was determined to be suitable for use in forensic casework as of June 27, 2011. *See* Exhibits K, L.

Tellingly, in July 2017 – not quite two months before co-authoring the September 1, 2017 LAS/FD Allegations asserting purported "malfeasance" with regard to FST – the Legal Aid Society specifically *requested* that OCME perform FST DNA analysis in a particular case in which they were defense counsel. *See* Exhibit I, Letter from Jennifer Ritter, Legal Aid Society, to J. Lucas Herman, OCME (July 11, 2017), and related email exchange. Apparently, the Legal Aid Society considers FST reliable when they believe that it will render results that are favorable to their client.

Multiple courts have also noticed this phenomenon; as one court wrote, "Justice Ralph Fabrizio recently pointed out that 'attorneys from the Legal Aid Society's DNA Unit have called criminalists from the OCME specifically to testify for the defense about likelihood ratios favorable to other defendants.' Thus, it appears to this Court that a *Frye* hearing is also unnecessary under the circumstances as even The Legal Aid Society appears to have accepted that it has reached the necessary degree of acceptance in the relevant scientific community, when the results are favorable to their clients."[7] Further, despite several attempts to convince the courts that this allele frequency cap renders FST unreliable, five courts in the last three months have found their arguments unpersuasive. *See id.*, specifically *People v. Donovan Owens*, Ind. No. 2400/2015 (NY Sup Ct. Bronx Cty, July 6, 2017); *People v. Donald James and Tiffany Washington*, Ind. No. 3336/2014 (NY Sup Ct., Bronx Cty, July 20, 2017); *People v. Donnell*

---

[7] *People v. Harvey Brown*, Ind. No. 58/2012 at pg. 4-5, (NY Sup. Ct., Kings Cty, June 4, 2015), *citing People v. Wendell Belle*, 47 Misc.3d 1218 (NY Sup. Ct. Bronx Cty 2015).

*Young*, Ind. No. 7968/2016 (NY Sup Ct. Kings Cty, August 17, 2017); *People v. Demetrius Blackwell*, Ind. 1081/2015 (NY Sup Ct., Queens Cty, September 25, 2017); *People v. Melquan Thawney*, Ind. No. 8183/2015 (NY Sup Ct., Kings Cty, October 17, 2017).

> b.  *OCME's Extensive Performance Checks Following the Modification of FST Fully Satisfied All Applicable Guidelines and Support the Modification*

Contrary to LAS/FD's assertions, neither a full revalidation nor resubmission to the DNA Subcommittee and the Commission was required for this upgrade/modification to the program, which did not affect FST's methodology. Rather, OCME conducted an extensive performance check that fully satisfied all applicable requirements of the Scientific Working Group on DNA Analysis Methods (SWGDAM) for the validations of both DNA Analysis Methods in general and Probabilistic Genotyping Systems in particular. *See* Scientific Working Group on DNA Analysis Methods, "Validation Guidelines for DNA Analysis Methods" (Approved 12/05/2016), available at https://docs.wixstatic.com/ugd/4344b0_50e2749756a242528e6285a5bb478f4c.pdf; Scientific Working Group on DNA Analysis Methods, "Guidelines for the Validation of Probabilistic Genotyping Systems" (Final Approved 06/15/2015), available at https://docs.wixstatic.com/ugd/4344b0_22776006b67c4a32a5ffc04fe3b56515.pdf.[8]

As is clear from the discussion above, the source code that was implemented following the modification was hardly, as LAS/FD assert, "a different iteration than the one originally in use when the FST was approved by the Commission and submitted to a scientific journal for peer review". LAS/FD Allegations at 4. The modification made did not meet SWGDAM's definition of a "material modification," which is "an alteration of an existing analytical procedure that may have a consequential effect(s) on analytical results; for example, a decrease in reaction volume of an amplification test kit that is already in use by the laboratory or a change in injection time for a genetic analyzer." Scientific Working Group on DNA Analysis Methods, "Validation Guidelines for DNA Analysis Methods" (Approved 12/05/2016) at 12, available at https://docs.wixstatic.com/ugd/4344b0_50e2749756a242528e6285a5bb478f4c.pdf. Rather, the modification was in the nature of a minor correction to address an incongruity that does not impact the results of the statistical analysis. *See* Exhibit K, Quality Control Test of Forensic Statistical Tool (FST).

The SWGDAM Guidelines are explicit that "[m]odification to the system such as a hardware or software upgrade that does not impact interpretation or analysis of the typing results of the statistical analysis shall require a *performance check* prior to implementation." SWGDAM, "Guidelines for the Validation of Probabilistic Genotyping Systems" ¶ 5.1 (emphasis added). Further, "[d]ata used during the initial validation may be re-evaluated as a

---

[8] OCME notes here that Executive Law §995(3), which LAS/FD cite in support of their argument, LAS/FD Allegations at 1, is irrelevant. That provision is merely a definitional section that defines "DNA testing methodology" as "methods and procedures used to extract and analyze DNA material, as well as the methods, procedures, assumptions, and studies used to draw statistical inferences from the test results." It neither prescribes nor addresses validation standards.

performance check or for subsequent validation assessment. The laboratory must determine the number and type of samples required to establish acceptable performance in consideration of the software modification." *Id.* ¶ 5.3; *see also* Scientific Working Group on DNA Analysis Methods, "Validation Guidelines for DNA Analysis Methods" § 7.2 ("A software upgrade that would not impact interpretation, the analytical process, or sizing algorithms shall require a performance check.") Again, looking at the results of the performance check, the overall conclusion would not have changed (*i.e.*, 0.34 and 0.42 are still "limited support for the defense hypothesis" and $3.38 \times 10^4$ and $3.82 \times 10^4$ are both "strong support for the prosecution hypothesis"). Therefore, this software change did not impact interpretation and certainly did not impact the analytical process. Clearly, revalidation was not required. *See id.* ¶ 5.2; *see also People v. Johnnie Jackson*, Ind. 727/2017, Affidavit of Eugene Lien (July 17, 2017), LAS/FD Allegations, Exhibit A ("Lien Aff.") ¶¶ 7-8.[9]

### 4. *OCME's Calculation of Drop-In and Drop-Out Rates is Scientifically Valid*

LAS/FD's spurious assertion that the data was "flattened" in the FST Validation, LAS/FD Allegations at 6, appears to reflect discomfort with the unavoidable existence of a degree of uncertainty inherent in the calculations underlying DNA analysis. Forensic scientists make best efforts to reduce uncertainty to the greatest extent possible, and the OCME Forensic Biology Department is always conservative in its estimates. Allelic drop-in and drop-out are stochastic phenomena that are observed in DNA analysis, and accordingly must be accounted for.

Thus, the drop-out rates were estimated empirically during the FST validation by looking at a range of samples, both single source and mixtures, where the profiles of the contributors was known and counting the number of times that an allele dropped out. These observations were then conservatively lowered by one standard deviation to estimate the rates. The drop-out rates are used in FST for several template amounts (i.e. 25 picograms, 50 picograms, 75 picograms, 100 picograms, 150 picograms, 250 picograms, and 500 picograms) and then interpolated for values between these amounts. A general trend of lower drop-out rates for higher template amounts (and vice versa) was observed. Using this general trend, rates of drop-out based on the amount of DNA that was amplified were estimated. For example, if it was observed during the validation that a template amount had a lower drop-out than a higher template amount (for example, 25 picograms showing a lower drop-out rate than 50 picograms), the lower rate was used for both values (*i.e.*, the 25 picogram rate is used). This choice was made because underestimating the drop-out rate is generally more conservative for a true non-contributor. As a

---

[9] Mr. Lien, the Technical Leader of the OCME Department of Forensic Biology, stated affirmatively that:

[T]he Department of Forensic Biology conducted a performance check of FST to confirm it was generating reliable results following the modification. Based on the results of that performance check, FST was put back online for use in casework on or about July 1, 2011.

Because this modification did not affect the methodology of the program, it did not require submission to the Commission on Forensic Science or the DNA Subcommittee. Further, the validation supports the version of FST supplied under court order.

Lien Aff ¶¶ 7-8.

result, the estimate errs on the side of a lower LR for a non-contributor even though it may also affect the LR for a true contributor.

Nor, as LAS/FD suggest, was there a lack of transparency on OCME's part. The validation summaries (executive summary and each individual volume summary) and the full validation studies were made available to the DNA subcommittee on two separate occasions, for as long as they wished to review the documents.

## B. LCN is Effective and Reliable

### 1. OCME's LCN DNA Analysis Was Properly Developed and Validated, and Was Approved Twice by the DNA Subcommittee and the Commission

LAS/FD misstate the facts underlying the DNA Subcommittee's and the Commission's approval of OCME's LCN DNA testing.

OCME used its LCN DNA testing on samples that were amplified with less than 100 picograms of DNA. LCN DNA samples underwent triplicate amplifications whereas high copy number (HCN) DNA samples only had a single amplification in most cases. Samples with a DNA quantitation greater than 100 picograms are amplified for 28 cycles, where samples with less than 100 picograms are amplified for 31 cycles. This technique underwent extensive validation studies, which reflected the presence of enhanced stochastic effects. As a result, OCME developed stringent lab protocols for LCN DNA testing that not only take into account the stochastic effects, but also compensate for them by calling for the most conservative interpretation. *See* Exhibit M, OCME LCN Validation Summary.

Once the validation studies were completed, they were presented to the DNA Subcommittee for its approval of the use of LCN DNA testing in forensic casework. At the September 9, 2005 Subcommittee meeting, Dr. Mechthild Prinz, then Director of the OCME Forensic Biology Department, provided a presentation on OCME's validation of the 31 cycle assay, including modifications that had been made to testing procedure using the Identifiler amplification kit,[10] additional experiments that had been performed using LCN STR Typing, the facility and logistics of how LCN would be conducted in the lab, and issues that arise with high sensitivity testing (drop-in/drop-out, peak imbalance, mixture recognition, and mixture interpretation). *See* Exhibit N, DNA Subcommittee Minutes (May 17, 2005). Following that discussion and presentation, then subcommittee chair Dr. Ballantyne moved that the DNA Subcommittee submit a binding recommendation to the Commission to approve OCME's use of LCN DNA testing, noting that the DNA Subcommittee had found that the methodology "has merit, that the appropriate validation studies have been completed, and that the assay should be approved for use in the lab. The motion was seconded by Dr. Werrett and passed by a majority vote." *Id.* at 4. *See* Exhibit O, Letter from John Ballantyne to Chauncey Parker (Oct. 6, 2005)

---

[10] The testing procedure using the Identifiler amplification kit was given an additional 3 cycles, higher voltage/ injection times on the capillary instrument, and enhanced interpretation procedures.

(making a binding recommendation that the Commission approve OCME's use of LCN DNA testing technique in forensic casework).

On December 6, 2005, the Commission on Forensic Science held a public meeting at which Dr. Prinz gave a presentation in support of OCME's request that the CFS approve the implementation of LCN DNA testing by OCME. *See* Exhibit P, Commission on Forensic Science, Meeting Minutes (Dec. 6, 2005).

LAS/FD cite no documentation for their assertion that, at the December 6, 2005 Commission meeting, "Peter Neufeld and other Commissioners asked Dr. Prinz, then Director of the Forensic Biology Laboratory, what were the lowest levels of DNA that OCME had validated internally it could get correct answers using the LCN method, and Dr. Prinz said 25 picograms", LAS/FD Allegations at 10 – presumably because there is no record of any such exchange. Rather, as reflected in the official Meeting Minutes from that date, after Mr. Neufeld expressed his concern about a minimum detection level of 20 picograms for proficiency testing – not even the 25 picograms claimed by LAS/FD – other members of the Commission "noted that proficiency tests are *not* generally manufactured at minimum threshold values as threshold is determined through test validation studies and the use of controls during the analysis process." *See* Exhibit P, *supra*, at 3 (emphasis added). Then, "[a]fter discussion, it was agreed that the minimum threshold proficiency testing issue would be referred to the DNA Subcommittee for further review and recommendation." *Id.*

Subsequently, Mr. Neufeld's motion to condition approval of OCME's use of LCN DNA testing on the lab's development of "an in-house proficiency testing program that tests at the 20 picogram threshold" *failed* by a vote of seven to three. The motion for *unconditional* approval of OCME's use of LCN DNA testing *passed* by a vote of seven to three. The Commission agreed to refer Mr. Neufeld's issues to the DNA Subcommittee for review. *Id.* at 3-4.

Accordingly, on December 14, 2005, the Chair of the Commission, Chauncey Parker, wrote to Dr. Ballantyne to inquire about "the feasibility and appropriateness for the periodic administration of an in-house proficiency challenge that simulates routine case work, designed to monitor performance at or around the validated minimum template amount (20 picograms)." *See* Exhibit Q, Letter from Chauncey G. Parker, Chair to John Ballantyne, Ph.D. (Dec. 14, 2005). Chair Parker further asked "that the Subcommittee provide observations or recommendations for the Commission." *Id.*

When Dr. Ballantyne responded on behalf of the Subcommittee, ten months later, he simply conveyed the Subcommittee's approval of the OCME's own proficiency testing protocol of August 21, 2006, which he attached to his brief cover letter. *See* Exhibit R, Letter from John Ballantyne, Ph.D., to Chauncey G. Parker, Chair (Sept. 18, 2006). That protocol states that analysts will run proficiency samples at the optimal amount of DNA for LCN testing (100pg) and that the DNA typing kit will be monitored to verify its sensitivity down to 6.25 picograms, *see* OCME, Department of Forensic Biology, Proficiency Testing Program for LCN DNA Testing (Aug 21, 2006), attached to Exhibit R. Clearly, the Subcommittee did not find a lower

limit of 20 picograms necessary for LCN DNA testing; on the contrary, "[t]he Subcommittee's review found the procedures described in the attachment as reasonable and appropriate to assure reliable results with this method and voted unanimously to make this binding recommendation to the Commission on Forensic Science to approve these procedures." *Id.*

### 2.   *LCN Has Resoundingly Been Approved in State and Federal Court*

Between 2006 and 2014, LCN was challenged in more than ten criminal cases. In each of those cases, it was found to be reliable and, therefore, admissible as evidence in criminal matters. *See* Exhibit S, List of Written State Court Decisions Admitting LCN in Criminal Cases. As a Kings County Supreme Court Justice recently noted in denying defendant a *Frye* hearing, "[r]ulings by other Judges finding a technique generally acceptable can obviate the need for a *Frye* hearing." *People v. Thawney*, Ind. No. 8183/2015 (NY Sup Ct Kings Cty, Oct. 17, 2017) at 8.[11]

### a.   *State Courts Have Generally Followed the Approval of* People v. Megnath

On February 8, 2010, in New York State Supreme Court, Queens County, Judge Robert Hanophy issued a widely followed decision upholding OCME's use of LCN DNA testing in casework. *See People v. Megnath*, 27 Misc.3d 405 (NY Supreme Ct Queens Cty 2010). At a hearing to determine whether the scientific method was generally accepted in the relevant scientific community, *see Frye v. United States*, 54 App. D.C. 46 (1923), Judge Hanophy took testimony from "five reputable [and credible] forensic scientists." Following that hearing, the Court held that "the LCN DNA testing method as it is performed by the OCME and is interpreted by OCME protocols, will consistently yield reliable results." *Megnath*, 27 Misc.3d 405 [2010]) at 411. The Court further found specifically that LCN is a reliable technique based on PCR-STR DNA testing that had already been recognized as the "gold standard" technique for DNA testing. *Id.* at 411. As the Court noted, LCN is "simply a more sensitive form of HCN DNA testing" that has been used to identify bodily remains, old bones and artifacts, and it has been used to determine birth defects during in vitro fertilization. *Id.* With regard to the greater likelihood of stochastic effects due to the more sensitive nature of LCN testing, the Court emphasized that,

> [s]ince forensic scientists have long been familiar with the scientific issues or phenomena that arise in both HCN [high copy number DNA testing] and LCN DNA testing, forensic scientists, including the OCME, have created interpretation protocols to account for these phenomena when they occur in both HCN and LCN testing. While [they may] occur more frequently in LCN DNA typing, the OCME has implemented interpretation protocols to compensate for these occurrences. The interpretation protocols that were developed by OCME to compensate for the scientific phenomena were formulated by the OCME based on their extensive validation studies regarding LCN DNA testing.

---

[11] Although the court in that case was addressing the acceptance of FST in the relevant scientific community, the same principle holds for any other scientific technique that has been so consistently approved by the courts.

*Id.* at 410.

The Court also noted specifically that LCN is not novel science or technology. "LCN DNA profiling as conducted by the OCME is not a novel scientific technique. DNA testing in the forensic community has been generally accepted as reliable for many years... The same analysis that is utilized in HCN DNA testing and which has been admitted nationally in our Courts for years, is basically the same type of DNA testing that is used when LCN DNA testing is performed by the OCME." *Id.* at 410.

This decision has proved highly influential: following *Megnath*, numerous New York State courts have accepted LCN DNA testing and ruled its results admissible in criminal matters, even denying requests for *Frye* hearings yet admitting the results of LCN DNA testing. *See* Exhibit S, List of State Court Decisions Admitting LCN in Criminal Cases; *see also supra* n.4.

### b.  *The Southern District of New York Approved LCN in United States v. Morgan*

LAS/FD claim that, "[i]n *U.S. v. Morgan*, the OCME reported a positive identification on a touched sample with only 14 picograms of total DNA. The sample was composed of *at least* three contributors, with some loci indicating the possibility of five or more total individual contributors to the sample." LAS/FD Allegations at 9 (original emphasis). LAS/FD's source for that assertion is unclear, since the OCME report issued for the *Morgan* case indicates unambiguously that OCME tested two swabs from a firearm, one swab was from the "front strap/back strap/side grip grooves," and the other was from the "slide grip grooves/release area." *See* Exhibit T, *United States v. Morgan*, 12-cr-00223- (GHW), Direct Examination of Dr. Craig O'Connor at 602-35. Human DNA sufficient for PCR DNA testing was found on those samples using the LCN testing method. The results of that testing indicated a mixture of DNA from what was best described as at least two people, including at least one major male contributor, Male Donor A, on the swab from the front strap/back strap/side grip grooves. The resulting profile from that Male Donor A was based on an 8-locus result with a random match probability of 1 in 1.43 million people. The DNA detected from the slide grip grooves/release area was not suitable for comparison. Based on these actual facts, OCME experts determined this mixture to be from at least two contributors, rather than the three or more concluded by the defense, whose experts did not persuade the court. *Id.*

Differences of opinion do not render the LCN method unreliable; if anything, they go to the weight to be given the evidence and can provide argument for lawyers' summations that may cast reasonable doubt in the minds of the jury. In *Morgan*, not only was the Court unconvinced by defense counsel's arguments against the reliability of LCN, *see United States v. Morgan*, 53 F. Supp. 3d 732 (SDNY 2014); clearly, the jury was also not persuaded. The Second Circuit Court of Appeals affirmed this result, and the United States Supreme Court declined to review that decision. *Id., aff'd*, 675 Fed.Appx. 53 (2d Cir.), *cert. denied*, — S.Ct. —, 2017 WL 2734816 (Mem).

The LAS/FD Allegations not only misstate the facts of *Morgan*, but they also falsely assert that "OCME had conducted no validation studies that confirm the accuracy of LCN testing under circumstances akin to those in the *Morgan* case." Much like their disingenuous presentation of OCME's reported results in *Morgan*, they also aim to mislead the Inspector General, and now the Commission and its Subcommittee, into believing that OCME has no validation studies to demonstrate LCN's reliability using a mixture of two people with a deduced Male Donor A. Taking the validation studies as a whole, especially Volumes 3 and 4 (sensitivity), Volume 8 (mock casework samples) and Volume 9 (mixture studies), the studies conclusively demonstrate that the results generated from LCN testing conducted on mixtures of two people, under circumstances akin to those in Morgan, produce reliable results.

### C. OCME Updated its DNA Technology in Keeping with Advances in Forensic Science and More Stringent FBI Requirements

As of January 1, 2017, OCME's Department of Forensic Biology began to use the Promega Powerplex Fusion STR kit, which enables identification of alleles at up to 24 loci (including the Amelogenin locus and a Y-chromosomal STR locus). Prior to this date, the lab had used Identifiler, which allowed viewing of only 16 loci (including the Amelogenin locus). This upgrade from Identifiler, which was paired with Genemapper ID, LCN testing, and FST, was implemented to accommodate the increase in the number of core loci from 13 to 20, which the FBI now requires to upload profiles into the CODIS database. Because Fusion was not validated to run with the semi-continuous FST program, OCME could not use the two products together and chose to upgrade to the fully continuous probabilistic genotyping tool STRMix which had become available since the advent of FST. Being fully continuous, STRMix considers more information in the profile and performs statistical models to analyze the sample. This is akin to going from using a paper map to using Google maps to estimate the time it may take you to drive from Manhattan to Albany.

LAS/FD claim that "OCME abandoned the LCN methodology and determined that the lower threshold for suitability for DNA testing is 37.5 picograms with that new kit." While the 37.5 picogram threshold was validated for the Fusion kit, going any lower than that would require using increased amplification cycles and modified interpretation protocols similar to those developed for use with the Identifiler kit. In order to employ that technique with Fusion, it would need to be validated for use with Fusion. In order to validate LCN for use with Fusion, OCME would need to expend not only an extensive amount of time, but also resources in performing such a series of studies. To determine whether such expenditure was beneficial for the lab, a cost/benefit analysis was done and it was decided that the number of cases with lower quantities of DNA than 37.5 picograms that yielded results, is negligible compared to the cost of performing a validation for Fusion/LCN and, as such, the OCME Department of Forensic Biology decided not to proceed with the validation.

Contrary to the unfounded assertion in the LAS/FD Allegations that LCN was abandoned because of reliability concerns, that was simply not the case. OCME stands by the reliability of

LCN and its results, as it does by the reliability of FST; our reasons for no longer using it were based on a balancing of lab resources versus the needs of our customers, and the data suggests that validation of this technique is simply not cost effective at this time.

### D. Eugene Lien Answered the Commission Truthfully and Accurately on October 24, 2014

The LAS/FD Allegations seek to perpetuate the false claim that Eugene Lien, Technical Leader of the Department of Forensic Biology at the OCME, lied to the Commission during questioning by then Commissioner Barry Scheck at a CFS meeting on October 24, 2014. *See* LAS/FD Allegations at 9-11. In fact, as Mr. Lien stated in a deposition in an unrelated employment lawsuit where this canard has also been advanced, and as should be patently clear to anyone reviewing the relevant documents, Mr. Lien spoke truthfully and accurately at that Commission meeting.

Mr. Scheck asked Mr. Lien exactly the following question:

In particular [uh], in terms of all the letters [uh] that I passed on [um] and the different briefing from [uh] the case in the southern district of New York, and the opinions of experts, it should be evident that the, the "principal complaint we are making . . . has this laboratory [OCME] ever done a validation study on samples, mixtures, [um] as was presented by the case in the southern district of [uh] in that instance, it was, I think, 14 or 16 picograms, I can't recall which, [um] but below 25 picograms with a mixture of [uh] three people, when the only validation study that has ever been published [um], and it wasn't on samples replicating casework it was on buccal swabs [uh] initially, with 50 picograms with mixtures of two people.

*See* Exhibit U, Unofficial Transcript of Meeting, Commission on Forensic Science (Oct. 24, 2014) at 2-3.

Mr. Lien's response, "Yes, we do," was entirely accurate. As Mr. Lien clarified in his deposition in *Stajic v. City of New York, et al.*, 16-CV-1258 (GHW), "Scientific validation must be taken as a whole. The entire validation constitutes the proper interpretation methodology and the proper use of low copy number testing. It's not just that volume that we are talking about. It's the entire validation that I am relying upon to answer that question." *See* Deposition of Eugene Lien, *Stajic v. City*, at 98:7-14 (attached in part to LAS/FD Allegations as Exhibit D and separately provided to the Commission in full). As Mr. Lien goes on to elaborate, the relevant tests described in volume 9A of the validation study, in combination with other tests conducted during the validation studies, properly support OCME's testing of samples below 25 picograms with mixtures of more than two contributors.[12]

---

[12] This interpretation is also supported by the expert report submitted by Dr. Craig O'Connor on behalf of OCME in *Stajic v. City*, Exhibit V, Expert Report of Dr. Craig O'Connor, *Stajic v. City of New York et al.*, as well as by Dr. O'Connor's deposition in the same litigation.

Comparison of the specific phrasing of Mr. Scheck's question with the colloquy during cross-examination of Dr. Craig O'Connor during the trial in *United States v. Morgan* instantly clarifies the differences between Mr. Scheck's question and the inquiry by defense counsel in *Morgan*, Rita Glavin, as well as the differences between Mr. Lien's response to Mr. Scheck and Dr. O'Connor's answers to Ms. Glavin's questions.

> Q. Okay. So Volume 9A, your mixture study, the lowest amount of mixture that you tested was 25 picograms, is that correct, for the mixture?
>
> A. That's correct.
>
> . . .
>
> Q. Now going to mixture study 9A, the mixtures that were studied, the maximum number of contributors, were two, is that correct?
>
> A. Yes, for 9A there were sets of mixtures with two contributors.
>
> . . .
>
> Q. OCME did not do mixture studies for LCN DNA testing where there were more than two contributors, isn't that correct?
>
> A. That's correct.
>
> Q. And you did not do these mixture studies where it goes below 25 picograms, is that correct?
>
> A. For mixtures, correct.

Exhibit T, Transcript, *United States v. Morgan*, Nov. 7, 2014 (659:21-660:16).

Unlike defense counsel in *Morgan*, Mr. Scheck did not ask Mr. Lien whether any *particular* component of the LCN mixture validation studies consisted of a mixture sample smaller than 25 picograms with more than two contributors. He asked whether OCME had conducted a validation study that validated its use of LCN DNA analysis on mixture samples smaller than 25 picograms with more than two contributors. Consistent with the SWGDAM guidelines, OCME had conducted the necessary validations to support its analysis of such samples, and that use was specifically approved – twice – by the DNA Subcommittee and by the Commission itself. *See* Exhibits N, O, P, Q, R.

This Commission now has an opportunity to put to rest, once and for all, the false assertion that Mr. Lien either misspoke – or, as has been more perniciously asserted by both the Legal Aid Society and Federal Defenders in its submission, and by plaintiff in *Stajic v. City of New York*, that Mr. Lien lied – in responding to Mr. Scheck's question at the October 24, 2014 Commission meeting. The debunking of this fabricated claim significantly undermines the unfounded assertion that the OCME committed any malfeasance.

Contrary to LAS/FD's assertion, and as demonstrated above – and approved by this Commission – Dr. Stajic's lawsuit did not "reveal" that OCME lacks sufficient validation for its

use of LCN on mixture samples below 25 picograms with more than two contributors. This assertion does not become truer by dint of repetition; thus, LAS/FD's citation to Dr. Stajic's false assertion hardly provides support for that same false assertion here.

### Conclusion

Thank you for your consideration of this refutation of the untrue and misleading allegations submitted by the Legal Aid Society and Federal Defenders. Please do not hesitate to let us know if you have questions or need additional information or materials.

Respectfully submitted,

Florence Hutner
General Counsel
Office of Chief Medical Examiner

# Appendix 6

Enter the allele calls from your FST worksheet into the gray bars.
ANY population summing to 0.97 or higher could cause the locus to be dropped by FST v2.0/2.5

| Locus | Allele 1 | Allele 2 | Allele 3 | Allele 4 | Allele 5 | Allele 6 | Allele 7 | Allele 8 | Allele 9 | Allele 10 | Freq sum | Locus | Unique alleles |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D8S1179 | 12 | 13 | 14 | 15 | 16 | | | | | | | D8S1179 | 5 |
| Asian | 0.139 | 0.19 | 0.181 | 0.184 | 0.061 | | | | | | 0.755 | Asian | |
| Black | 0.116 | 0.148 | 0.384 | 0.216 | 0.064 | | | | | | 0.928 | Black | |
| Caucasian | 0.116 | 0.289 | 0.252 | 0.132 | 0.033 | | | | | | 0.822 | Caucasian | |
| Hispanic | 0.109 | 0.321 | 0.199 | 0.166 | 0.033 | | | | | | 0.828 | Hispanic | |
| D21S11 | 29 | 30 | 30.2 | 32.2 | | | | | | | | D21S11 | 4 |
| Asian | 0.268 | 0.252 | 0.016 | 0.158 | | | | | | | 0.694 | Asian | |
| Black | 0.16 | 0.18 | 0.028 | 0.064 | | | | | | | 0.432 | Black | |
| Caucasian | 0.198 | 0.281 | 0.045 | 0.136 | | | | | | | 0.66 | Caucasian | |
| Hispanic | 0.205 | 0.219 | 0.023 | 0.119 | | | | | | | 0.566 | Hispanic | |
| D7S820 | 9 | 10 | 11 | 12 | | | | | | | | D7S820 | 4 |
| Asian | 0.068 | 0.155 | 0.368 | 0.197 | | | | | | | 0.788 | Asian | |
| Black | 0.132 | 0.34 | 0.204 | 0.116 | | | | | | | 0.792 | Black | |
| Caucasian | 0.112 | 0.281 | 0.269 | 0.14 | | | | | | | 0.802 | Caucasian | |
| Hispanic | 0.103 | 0.268 | 0.262 | 0.175 | | | | | | | 0.808 | Hispanic | |
| CSF1PO | 9 | 10 | 11 | 12 | 13 | | | | | | | CSF1PO | 5 |
| Asian | 0.065 | 0.229 | 0.258 | 0.342 | 0.081 | | | | | | 0.975 | Asian | |
| Black | 0.024 | 0.292 | 0.216 | 0.288 | 0.032 | | | | | | 0.852 | Black | |
| Caucasian | 0.033 | 0.264 | 0.331 | 0.277 | 0.066 | | | | | | 0.971 | Caucasian | |
| Hispanic | 0.017 | 0.281 | 0.285 | 0.325 | 0.05 | | | | | | 0.958 | Hispanic | |
| D3S1358 | 14 | 15 | 16 | 17 | | | | | | | | D3S1358 | 4 |
| Asian | 0.035 | 0.348 | 0.361 | 0.203 | | | | | | | 0.947 | Asian | |
| Black | 0.068 | 0.312 | 0.292 | 0.24 | | | | | | | 0.912 | Black | |
| Caucasian | 0.132 | 0.24 | 0.236 | 0.273 | | | | | | | 0.881 | Caucasian | |
| Hispanic | 0.04 | 0.351 | 0.298 | 0.195 | | | | | | | 0.884 | Hispanic | |
| TH01 | 6 | 7 | 8 | 9 | 9.3 | | | | | | | TH01 | 5 |
| Asian | 0.11 | 0.271 | 0.061 | 0.465 | 0.045 | | | | | | 0.952 | Asian | |
| Black | 0.108 | 0.408 | 0.248 | 0.136 | 0.092 | | | | | | 0.992 | Black | |
| Caucasian | 0.231 | 0.161 | 0.124 | 0.19 | 0.285 | | | | | | 0.991 | Caucasian | |
| Hispanic | 0.242 | 0.235 | 0.132 | 0.152 | 0.232 | | | | | | 0.993 | Hispanic | |
| D13S317 | 8 | 10 | 11 | 12 | 13 | 14 | | | | | | D13S317 | 6 |
| Asian | 0.284 | 0.184 | 0.216 | 0.139 | 0.039 | 0.016 | | | | | 0.878 | Asian | |
| Black | 0.02 | 0.02 | 0.364 | 0.376 | 0.144 | 0.044 | | | | | 0.968 | Black | |
| Caucasian | 0.161 | 0.021 | 0.273 | 0.326 | 0.091 | 0.033 | | | | | 0.905 | Caucasian | |
| Hispanic | 0.099 | 0.063 | 0.238 | 0.315 | 0.136 | 0.046 | | | | | 0.897 | Hispanic | |
| D16S539 | 9 | 10 | 11 | 12 | 13 | | | | | | | D16S539 | 5 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Asian | 0.245 | 0.142 | 0.268 | 0.21 | 0.106 | | | 0.971 | Asian |
| Black | 0.196 | 0.108 | 0.288 | 0.22 | 0.152 | | | 0.964 | Black |
| Caucasian | 0.099 | 0.062 | 0.298 | 0.351 | 0.14 | | | 0.95 | Caucasian |
| Hispanic | 0.199 | 0.123 | 0.255 | 0.209 | 0.152 | | | 0.938 | Hispanic |
| **D2S1338** | **17** | **18** | **19** | **21** | **23** | **24** | | **D2S1338** | **6** |
| Asian | 0.055 | 0.119 | 0.21 | 0.039 | 0.194 | 0.135 | | 0.752 | Asian |
| Black | 0.108 | 0.056 | 0.142 | 0.14 | 0.108 | 0.098 | | 0.652 | Black |
| Caucasian | 0.173 | 0.063 | 0.138 | 0.026 | 0.115 | 0.118 | | 0.633 | Caucasian |
| Hispanic | 0.212 | 0.041 | 0.228 | 0.026 | 0.114 | 0.085 | | 0.706 | Hispanic |
| **D19S433** | **12** | **13** | **14** | **15** | | | | **D19S433** | **4** |
| Asian | 0.026 | 0.245 | 0.277 | 0.068 | | | | 0.616 | Asian |
| Black | 0.108 | 0.298 | 0.21 | 0.048 | | | | 0.664 | Black |
| Caucasian | 0.077 | 0.289 | 0.341 | 0.158 | | | | 0.865 | Caucasian |
| Hispanic | 0.062 | 0.16 | 0.317 | 0.135 | | | | 0.674 | Hispanic |
| **vWA** | **13** | **14** | **15** | **16** | **17** | **18** | **19** | **vWA** | **7** |
| Asian | 0.016 | 0.239 | 0.035 | 0.168 | 0.252 | 0.158 | 0.11 | 0.978 | Asian |
| Black | 0.028 | 0.06 | 0.212 | 0.264 | 0.228 | 0.096 | 0.072 | 0.96 | Black |
| Caucasian | 0.021 | 0.103 | 0.124 | 0.182 | 0.277 | 0.198 | 0.095 | 1 | Caucasian |
| Hispanic | 0.017 | 0.07 | 0.132 | 0.291 | 0.228 | 0.142 | 0.109 | 0.989 | Hispanic |
| **TPOX** | **6** | **8** | **9** | **10** | **11** | **12** | | **TPOX** | **6** |
| Asian | 0.016 | 0.513 | 0.165 | 0.032 | 0.274 | 0.016 | | 1.016 | Asian |
| Black | 0.044 | 0.324 | 0.212 | 0.104 | 0.28 | 0.02 | | 0.984 | Black |
| Caucasian | 0.021 | 0.624 | 0.12 | 0.037 | 0.174 | 0.037 | | 1.013 | Caucasian |
| Hispanic | 0.02 | 0.44 | 0.116 | 0.056 | 0.301 | 0.063 | | 0.996 | Hispanic |
| **D18S51** | **12** | **14** | **15** | **16** | **19** | **20** | | **D18S51** | **6** |
| Asian | 0.058 | 0.184 | 0.152 | 0.145 | 0.052 | 0.035 | | 0.626 | Asian |
| Black | 0.064 | 0.084 | 0.204 | 0.16 | 0.068 | 0.048 | | 0.628 | Black |
| Caucasian | 0.12 | 0.207 | 0.157 | 0.116 | 0.021 | 0.021 | | 0.642 | Caucasian |
| Hispanic | 0.103 | 0.175 | 0.159 | 0.123 | 0.05 | 0.026 | | 0.636 | Hispanic |
| **D5S818** | **10** | **11** | **12** | **13** | | | | **D5S818** | **4** |
| Asian | 0.213 | 0.297 | 0.248 | 0.103 | | | | 0.861 | Asian |
| Black | 0.068 | 0.252 | 0.344 | 0.236 | | | | 0.9 | Black |
| Caucasian | 0.079 | 0.281 | 0.351 | 0.236 | | | | 0.947 | Caucasian |
| Hispanic | 0.056 | 0.308 | 0.338 | 0.169 | | | | 0.871 | Hispanic |
| **FGA** | **19** | **22** | **23** | **24** | **26** | | | **FGA** | **5** |
| Asian | 0.058 | 0.152 | 0.219 | 0.19 | 0.035 | | | 0.654 | Asian |
| Black | 0.076 | 0.196 | 0.172 | 0.144 | 0.052 | | | 0.64 | Black |
| Caucasian | 0.099 | 0.178 | 0.132 | 0.124 | 0.041 | | | 0.574 | Caucasian |
| Hispanic | 0.043 | 0.195 | 0.149 | 0.123 | 0.056 | | | 0.566 | Hispanic |
| | | | | | | | | Total unique alleles | 76 |